PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
02/02/2000
THOMAS K. KAHN
CLERK

No. 97-6349

D.C. Docket No. CV 85-T-665-N

JOHNNY REYNOLDS, individually on behalf of himself and as representative of a class of black employees of the Highway Department, State of Alabama, similarly situated,

                              Plaintiff-Appellee-Cross-Appellant,

CECIL PARKER, et al.,

                              Intervenors-Appellee-Cross-Appellant,

    versus

G. M. ROBERTS, in his official capacity as Director for the Alabama Department of Transportation, et al.,

                              Defendants-Appellants.

Appeal from the United States District Court
for the Middle District of Alabama

**(February 2, 2000)**

Before TJOFLAT and DUBINA, Circuit Judges, and STORY*, District Judge

_____
*Honorable Richard W. Story, U.S. District Judge for the Northern District of Georgia, sitting by designation.

TJOFLAT, Circuit Judge:

This appeal arises out of a long-standing racial discrimination class action brought by job applicants and two groups of employees and former employees against the Alabama Department of Transportation. After the parties entered into a race-neutral consent decree providing for prospective relief relating to job qualifications and promotion criteria, the district court, sua sponte, entered a judgment awarding the members of one of the employee groups (of current and former employees) back pay in the sum of $17,450,077, plus interest in the sum of $17,282,410. Reynolds v. Alabama Dep't of Transp., 996 F. Supp. 1156 (M.D. Ala. 1998). The Department of Transportation appeals. We vacate the judgment and remand the case for further proceedings consistent with this opinion.

I.

The named plaintiffs brought this suit against the Department of Transportation (the "Department") in May 1985 on behalf of all black "merit" and "non-merit" employees and former employees of the Department and all unsuccessful black applicants for positions within the Department.[1] Alleging

---

[1] In addition to the Department, the plaintiffs sued various state officials. The lawsuit was styled initially as Reynolds v. King. It became Reynolds v. Roberts, then Reynolds v. Alabama Department of Transportation. Its present style is Reynolds v. Butts; Butts was the director of the Department when the Department took this appeal. He has been replaced by G. M. Roberts. We refer to the defendants in this case collectively as the Department.

The instant lawsuit has become intertwined with a racial discrimination suit

2

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, 42 U.S.C. § 1981, and the Equal Protection Clause of the Fourteenth Amendment, plaintiffs sought monetary and injunctive relief under those statutes and under 42 U.S.C. § 1983. According to the plaintiffs, the Department was discriminating against all black employees and job applicants on account of their race, and had been doing so since an unspecified point in time prior to May 21, 1979. The discrimination consisted of (1) using non-job related criteria that had the effect of precluding blacks from being hired or promoted, (2) prohibiting black employees from gaining the job experience necessary for promotion, and (3) granting promotions and pay increases to white employees who were less qualified than their black counterparts. The Department, in its answer, denied the plaintiffs' allegations.[2]

---

brought by the United States against the Alabama State Personnel Board and various state agencies. United States v. Frazer, 317 F. Supp. 1079 (M.D. Ala. 1970). After a bench trial, the district court found that the Board and the defendant agencies had systematically discriminated against blacks and ordered injunctive relief. See id. In a subsequent proceeding in that case, the court found that the Department of Transportation was using employment registers to maintain an all-white workforce and to circumvent the court's injunction; it therefore entered additional injunctive relief. See United States v. Frazer, No. 2709-N (M.D. Ala. Aug. 20, 1976). In their complaint in the instant case, the plaintiffs alleged that the Department was not complying with the injunctions in Frazer. In July 1992, the district court consolidated the still-pending Frazer suit, now styled United States v. Ballard, with the instant case.

[2] The Department's answer also presented affirmative defenses not relevant here.

3

In October 1986, the court certified three plaintiff classes. The first class consisted of any black person who unsuccessfully applied for a merit position in the Department at any time after May 21, 1979. The second class included all blacks employed by the Department at any time after May 21, 1979 who were permanent employees under the Department's merit system (the "merit" employees) and therefore eligible for promotion. The third class consisted of a portion of the blacks employed by the Department at any time after May 21, 1979 as temporary employees (the "non-merit" employees). During their employment in the Department, these employees had applied for merit positions, but the Department allegedly had rejected their applications on account of their race. Each class sought injunctive relief in the form of an order directing the Department to discontinue its current hiring and promotion policies and practices and requiring it to implement an affirmative action program. In addition, each class member sought injunctive and compensatory relief. The members of the first class sought the positions they would have received but for the Department's discriminatory hiring policies, together with the pay they would have earned. Each member of the second class contended that he or she had been denied promotion(s) on account of race, and therefore sought an order granting the promotion(s) and/or back pay. Each member of the third class contended that, while employed in the Department,

4

he or she had applied for, but had been denied, merit-employee status on account of race, and therefore sought instatement in such status and/or back pay.

After the parties joined issue, and engaged in discovery, they entered into settlement negotiations. In 1988, and again in 1991, they presented a proposed consent decree to the district court for approval. On each occasion, some members of the plaintiff classes objected to the entry of the decree; the district court sustained their objections and refused to enter the decree.

In June 1992, the case proceeded to trial before the court. Near the end of the plaintiffs' case, the parties asked the court to recess the proceeding indefinitely so that they could engage in further settlement negotiations. The court granted their request. In November 1993, they reached a partial settlement, in the form of a proposed consent decree. The proposed decree provided a range of prospective class-wide injunctive relief. Among other things, it set hiring and promotion quotas for blacks – 33% of the positions in each job classification in the Department would be set aside for blacks. To ensure an adequate pool for this set-aside program, the decree directed the Department to mount an aggressive recruiting campaign at historically black colleges and universities. Finally, the decree required the Department to establish a grievance procedure for its employees.

The parties presented the proposed decree to the district court, which, in turn, scheduled a hearing for January 19, 1994 to entertain any objections members of the plaintiff classes, or others likely to be affected (like white employees of the Department), might have to the terms of the proposed decree. On January 13, a group of white Department employees (the "Adams Intervenors") moved the court for leave to intervene on behalf of the Department's non-black employees in order to challenge the race-conscious provisions of the proposed decree – specifically, the 33% quota requirement for all job classifications in the Department. The court granted the motion, Reynolds v. Roberts, 846 F. Supp. 948, 953-54 (M.D. Ala. 1994), and subsequently certified an additional class, consisting of the Department's non-black employees.

The January 19 hearing was held as scheduled. Over 200 people attended the hearing, including many non-black employees of the Department. The objections to the race-conscious aspects of the proposed consent decree were such that the parties withdrew it and, with leave of court, went back to the drawing board. By late February 1994, the plaintiffs and the Department decided to divide the previously proposed decree into three parts, called Consent Decrees I, II, and III. Consent Decree I contained the provisions that all sides agreed provided only race-neutral prospective relief. Consent Decrees II and III contained provisions

that were acceptable to the plaintiffs and the Department, but opposed as race-conscious by the Adams Intervenors.

The parties submitted Consent Decree I to the district court for approval, and, on March 7, the court held a hearing on the fairness of the proposal. No one other than the parties' attorneys appeared at the hearing, and no one objected to the entry of the decree. The court approved the decree and, by order entered March 16, 1994, adopted it in full.[3]

Consent Decree I is composed of a series of "Articles" which revamped the process by which the Department hires, promotes, classifies, and pays its employees. The decree abolished the system of "employment registers" from which positions were filled and promotions were granted, and created new qualifications and procedures for hiring and promotion. It also created new procedures for, among other things, rotation of job duties, recruitment, and training.

---

[3] Although it is not clear from the record, it appears that, after the entry of Consent Decree I, the plaintiffs and the Department presented Consent Decrees II and III to the district court for approval. On January 23, 1998, after the filing of this appeal, the court, over the Adams Intervenors' objection, entered an order adopting one paragraph of Consent Decree II. See Reynolds v. Alabama Dep't of Transp., 996 F. Supp. 1118 (M.D. Ala. 1998). The Adams Intervenors have challenged this action in a separate appeal to this court, No. 98-6102. That appeal is still in the briefing stage.

The provisions of the decree at issue in this appeal are portions of the Preamble, Article 19 and Article 20.[4]  They address the race-discrimination claims of the individual members of the three plaintiff classes – the merit employees, the non-merit employees, and the unsuccessful job applicants – and provide for the trial of those claims before the court in the event they are not settled.[5]

The Preamble to the Consent Decree states:

> The following terms and provisions of this Consent Decree are accordingly agreed to in final and complete resolution of all class issues which have been asserted in the case, subject to the provisions of this Decree providing for further proceedings, including but not limited to Article[] 20. . . .

Similar language is repeated in Article 19, titled "General":

> Subject to the provisions of this Decree permitting or requiring further proceedings, including but not limited to, Article[] 20 . . ., this Decree constitutes full and complete relief on all claims, causes of action, and allegations which have been asserted in this action.

Article 20 explains how the members of the three plaintiff classes and the Department are to proceed with the individual claims of race discrimination.

---

[4] The Articles of the decree are designated with Roman numbers.  The texts of the Articles, however, refer to the Articles in Arabic numbers.  For simplicity, we employ the latter.

[5] The Preamble and the relevant portions of Articles 19 and 20 in referring to the "trials" of the class members' claims "by the Court" are silent, as are the parties' briefs on appeal, as to whether such claims are to be tried to the district court or to a jury.

8

Because this article is at the heart of the dispute in this case, we reprint the article

in its entirety:

ARTICLE 20
FURTHER PROCEEDINGS REGARDING CLASS MEMBERS

1. Further negotiations and proceedings are required to resolve the claims for monetary and non-monetary remedies for individual members of the class[es] (including the named plaintiffs and intervenors), provided however, that this Decree does not in and of itself entitled [sic] any such class member to such remedies. Such claims shall be resolved first by settlement negotiations and then, to the extent not resolved by settlement negotiations, by the Court.
2. The parties will make all reasonable efforts to resolve all such claims of the members of the class (including the named plaintiffs and intervenors) according to a schedule to be mutually agreed upon within 10 days after preliminary approval of this Decree by the Court or, in the event the parties cannot mutually agree on such schedule within such 10 day period, the Court will enter an Order embodying a schedule. Regardless of whether the schedule is mutually agreed upon by the parties or embodied in an Order entered by the Court, such schedule shall contain specific deadlines for the exchange of information and for offers and counter-offers to enable settlement negotiations on such claims to take place within 90 days after the effective date of this Consent Decree and, in the event such settlement cannot be achieved, for trial on that phase of the case to commence no later than 180 days after the effective date of this Decree.
3. Such schedule shall be presented to the Court for approval or modification, and once finalized shall be entered as an Order of the Court. In the absence of agreement on such schedule within 10 days of the preliminary approval of this Decree, the Court will enter its own schedule aimed at settlement negotiations taking place within 90 days after the effective date of this Decree and scheduling that phase of the

9

trial of this case to commence no later than 180 days after the effective date of this Decree.[6]

For reasons not appearing in the record, the parties could not agree on a schedule "for the exchange of information and for offers and counter-offers," as required by Article 20; nor did the district court enter "its own schedule aimed at settlement negotiation . . . and scheduling that phase of the trial of this case," involving the claims of the individual class members, as contemplated. Further, neither counsel nor the court were able to adhere to the time table prescribed by Article 20. Rather, counsel for the plaintiffs and the Department undertook to establish a means to identify the members of the merit-employee class (both current and former employees) who might have meritorious claims that the Department, on account of their race, (1) either refused to assign them work that would qualify them for promotion to a higher job classification or (although they were qualified for such promotion) refused to promote them, or (2) treated them as if they had been promoted to a higher job classification by assigning them work in such classification, but refused to pay them the wage called for by that classification. Counsel were unsuccessful in this endeavor.

_____

[6] In providing for the disposition through settlement or trial of the claims of the individual class members, Article 20 parenthetically includes the claims of the "intervenors," meaning the individual members of the Adams Intervenor class. Because the members of that class have asserted no claims of race discrimination, we are at a loss as to why they were included in Article 20.

10

When counsel for the plaintiffs and the Department were unable to arrive at a means to identify the meritorious claims, plaintiffs' counsel, in January 1995, filed a "Motion to Set Hearing to Determine Method of Back-Pay Calculation."  In that motion, plaintiffs' counsel asserted for the first time that Consent Decree I had resolved that the Department had discriminated against each  member of the three plaintiff classes as alleged.  In other words, in addition to conceding that its policies and practices for hiring, job assignment, and promotion were racially discriminatory and should be struck down, the Department had admitted that it had discriminated against the individual members of the plaintiff classes on account of their race when it denied them employment or promotion(s) and the wages they would have earned.  In light of such an admission of liability, plaintiffs' counsel contended, the litigation should proceed to the next step:  a determination of  the amount of back pay due the unsuccessful job applicants (for merit positions), the merit employees, and the non-merit employees.  In short, everyone would recover something.

The plaintiffs moved the court to determine a method for calculating back pay in an effort to avoid a separate trial on the damages element of each individual class member's claim.  If required to try each claim separately, plaintiffs suggested,

11

the "process would degenerate into [a] quagmire of hypothetical judgments."  One

of the methods plaintiffs proposed was

> 'a formula of comparability or representative employee earnings
> formula.'  With that method, 'approximations are based on a group of
> employees, not injured by the discrimination, comparable in size,
> ability and length of employment – such as "adjacent persons on the
> seniority list or the average progress of persons with similar seniority"
> – to the class of plaintiffs.'[7]

The Department's immediate response to the plaintiffs' motion was to deny

that Consent Decree I determined that it was liable to the individual class members

as plaintiffs contended.  Without deciding whether Consent Decree I had

adjudicated the Department's liability to the individual class members for back

pay, the district court ordered the parties to begin negotiations on a class-wide

formula for determining back pay – as if the Department were liable to each class

member for back pay.  The Department complied with the court's order, but

continued to assert that, if the case did not settle, the trial, which had been

interrupted in 1992, should resume.  In the Department's view, absent a global

settlement, the parties would have to return to the courtroom and litigate (1)

whether the Department had discriminated against all black employees and job

---

[7] The plaintiffs took this language from the former Fifth Circuit's decision in Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 262 (5th Cir. 1974) (Pettway III).  Neither the plaintiffs' motion nor the record indicates precisely what the quoted language was supposed to mean in the context of the instant case.

applicants on account of their race, as alleged in the plaintiffs' complaint, and, if the Department had done so, (2) whether it had discriminated against the individual members of the three plaintiff classes, as alleged.

The parties began their negotiations by focusing on the class consisting of the merit employees (both current and former) who had been denied promotion(s). They deferred to another day discussion of formulae that would apply to the classes consisting of job applicants and non-merit employees (who were denied instatement in merit positions) because arriving at formulae for those classes would apparently be problematic. On August 28, 1995, the parties jointly filed a "Report of Points of Agreement and Disagreement Regarding Formula for Determination of Remedies under Article Twenty of Consent Decree I" (referred to herein as the "August 28 Report"), which summarized where the parties stood in their negotiations over a back pay formula for the merit employees.

The parties agreed to a basic framework for determining the amount a class member should recover; they disagreed, however, as to what a class member would have to demonstrate in order to recover. The plaintiffs' position was that Consent Decree I had settled the liability issue; therefore, all a class member would have to show was the difference (if any) between what the member and a similarly situated white employee were paid during the class member's employment. The

13

Department agreed that the amount of a class member's recovery should be determined by comparing the class member's pay with a similarly situated white employee's pay; it disagreed, however, as to which white employees would be used for comparison purposes (and whether members of the merit employee class should have the right to opt out and sue the Department separately). In addition, the Department continued to maintain that, in order to recover anything, a class member had to show that he or she had been denied promotion(s) on account of race.

Having been advised of the parties' disagreements on the issues of the Department's liability (to the members of the three plaintiff classes) and an appropriate back pay formula (for the merit employees), the district court, in May 1996, held hearings on the back pay formula, and entertained testimony from plaintiffs' and the Department's experts and from an expert the court had appointed. At the beginning of these hearings, the court addressed the threshold liability issue and announced (from the bench) that Consent Decree I had established "class-wide liability" against the Department on the claims of the individual members of each of the three plaintiff classes.[8] The court further stated

---

[8] The court based its ruling on statements the parties' attorneys purportedly had made at a previous hearing on the plaintiffs' request for the award of interim attorney's fees; the court did not identify, however, the statements on which it was relying. On May

14

that its rulings on the back pay formula for the merit employees would "proceed . . . based on that finding [of liability]."  After hearing evidence from the expert witnesses, the court struggled with the problem of identifying the white employees who should be compared with a given class member for purposes of determining how much back pay to award the class member.  In the process of doing this, the court apparently realized, though it did not explicitly acknowledge, that, notwithstanding its earlier conclusion that in entering into Consent Decree I the Department admitted that it had discriminated against every class member, the Department had not discriminated against some class members.[9]  Consequently, these class members had not been injured and therefore were not entitled to promotion or back pay.[10]

By January 1997, the district court identified the members of the merit class who were not entitled to relief (promotion or back pay):  Any member of the class who had earned as much or more than the average pay earned by comparable white

16, 1996, the court issued a written order, affirming practically verbatim what it had stated from the bench.

[9] In other words, although the Department had a policy of discriminating against black merit employees on account of their race, the Department had not implemented the policy in some cases.

[10] Previously, in negotiating over a method, or formula, for determining how much back pay the members of the merit class should recover, the parties agreed that some class members were not entitled to back pay.

15

employees had not been injured and thus would neither be promoted nor receive back pay. The remaining members of the class would receive back pay in accordance with a court-modified version of the formulae the parties had submitted in the August 28 Report.[11]

Once the court made these rulings, the plaintiffs filed a "Motion for Entry of Judgment." On April 16, 1997, the court granted the motion and gave the merit employees (who had been injured) judgment for $34,732,487. That sum consisted of $17,450,077 in back pay and $17,282,410 in interest.[12]

The Department appeals this judgment.[13] The plaintiffs cross appeal, challenging the formula the district court used in identifying the class members who were not entitled to relief and in calculating the back pay for the remainder of the class. We conclude that the district court erred in interpreting Consent Decree I as an admission of liability by the Department – that it had discriminated against the three plaintiff classes, and the individual members thereof, with respect to its

---

[11] In addition to these rulings, the court held that no member of the merit employee class could opt out and sue the Department separately. This ruling effectively granted the Department judgment on the claims of the non-injured members of the merit employee class.

[12] The court ordered the Department to deposit the total amount of the judgment in escrow within 60 days.

[13] The judgment at issue is a partial final judgment. The court entered the judgment pursuant to Fed. R. Civ. P. 54(b), thereby making it appealable under 28 U.S.C. § 1291.

The Adams Intervenors also appeal the district court's judgment. Since their claims of error are the same as the Department's, we refer to both appeals as the Department's appeal.

hiring and promotion decisions.  We therefore vacate the judgment at issue and remand the case for further proceedings.  Given this disposition, the plaintiffs' appeal is moot, and we accordingly dismiss it.

## II.

The Department contends that the district court erred in interpreting Consent Decree I to establish "class-wide liability" such that the merit employees could obtain relief without demonstrating that they were denied promotion(s) or back pay on account of their race.  The plaintiffs, in addition to asking us to affirm the district court's judgment, contend that a waiver of appeal provision in Consent Decree I bars the Department's appeal.[14]  If the plaintiffs are correct, we need not consider the Department's appeal.  We therefore address this issue first.

## A.

The waiver of appeal provision relied upon by the plaintiffs appears in Article 19 of the consent decree:

> All parties agree and stipulate that there will be no appeal from this
> Consent Decree or from any ruling, order, or decision entered by the

---

[14] The plaintiffs moved this court to dismiss the Department's appeal, and we carried their motion with the case.  We now deny their motion.

Court in the case relating to any issue or subject encompassed within the terms of this Decree. Nothing herein shall prohibit the non-class employees or any other person not a party to this Decree from having the right to appeal any interpretation, ruling, decision or order.

As a general rule, "[a] party normally has no standing to appeal a judgment to which he or she consented." 5 Am. Jur. 2d Appellate Review § 619 (1995). See White v. Commissioner of Internal Revenue, 776 F.2d 976, 977 (11th Cir. 1985). Accordingly, the words "there will be no appeal from this Consent Decree" were not needed to preclude appellate review of the decree's substantive provisions. There are exceptions to the general rule; one is that an appeal will lie if "the judgement allegedly deviates from the terms of the parties' agreement." 5 Am. Jur. 2d Appellate Review § 619 (1995). The Department invokes this exception by contending that, in interpreting the decree to create "class-wide liability," the district court effectively entered a new decree, one that "deviates from the terms of the parties' agreement." The district court's deviation, therefore, is subject to appellate review.

If the Department is correct, the plaintiffs respond, Article 19's waiver-of-appeal provision is meaningless – specifically, the words "there will be no appeal . . . from any ruling, order, or decision entered by the Court in the case relating to any issue or subject encompassed within the terms of this Decree." The district court's interpretation of the decree to establish "class-wide liability," including the

18

Department's liability to the individual class members, necessarily relates to an "issue or subject encompassed within the terms" of the decree; accordingly, the plaintiffs contend, the interpretation is not subject to appellate review.

If the plaintiffs are correct, the waiver provision would bar appellate review of any interpretation the district court might give the decree. The provision would also bar appellate review of the court's disposition of the individual claims for instatement, promotion, or back pay – regardless of the errors the court might commit in disposing of those claims.[15] In short, the waiver provision would give the district court unbridled discretion to rewrite Consent Decree I – as long as the court's "ruling, order or decision" "relat[es] to" or is "encompassed within the terms" of the decree.

Long standing precedent evinces a strong public policy against judicial rewriting of consent decrees. "[A] district court may not impose obligations on a party that are not unambiguously mandated by the decree itself." King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995). As the following discussion makes clear, the district court rewrote Consent Decree I, and imposed an obligation on the Department that the decree did not "unambiguously mandate[]," when it

---

[15] Implicit in the decree's provisions regarding the litigation of the individual claims for relief – specifically, Article 20, which we quote in the text supra – is the notion that the court would properly apply the law. In theory, Article 19's waiver provision would bar review of any error the court might make in processing those claims, no matter how fundamental the error might be.

19

declared that the Department, in entering into the decree, had conceded "class-wide liability," including liability to the members of the three plaintiff classes. Accordingly, the waiver-of-appeal provision of Article 19 does not bar the Department's appeal, which we now consider.

## B.

As a general matter, the rules we use to interpret a consent decree are the same ones we use to interpret a contract – since a consent decree is a form of contract. See Jacksonville Branch, NAACP v. Duval County Sch. Bd., 978 F.2d 1574, 1578 (11th Cir. 1992). What a contract provision means, or whether it is ambiguous, are questions of law, which we review de novo. See Equitable Life Assurance Soc'y v. Sublett (In re Sublett), 895 F.2d 1381, 1384 (11th Cir. 1990). If the contract provision is ambiguous and the trial court must look to extrinsic evidence to determine the parties' intent, we review its findings of fact (or those of the jury) as to the parties' intent for clear error. United Benefit Life Ins. Co. v. United States Life Ins. Co., 36 F.3d 1063, 1065 (11th Cir. 1994). With these principles in mind, we consider the Department's argument that Consent Decree I did not establish the liability the district court found.

The district court did not articulate its reasons for concluding that the consent decree rendered the Department liable for the relief the members of the three plaintiff classes were seeking until after the Department took this appeal on April 24, 1997.  In fact, we suspended the briefing schedule for this appeal pending the district court's issuance of an order explaining the basis for its finding of liability – in particular, the basis for awarding the merit employees back pay relief without entertaining proof of their respective claims.

On March 18, 1998, the district court issued its order.  Reynolds v. Alabama Dep't of Transp., 996 F. Supp. 1156 (M.D. Ala. 1998).  In that order, the court stated that "neither Consent Decree I, nor the August 28 report, expressly indicated whether class-wide discrimination ha[d] been established."  In fact, the most plausible reading of the consent decree "at first blush" was that "the issue [of liability] had been left open, with the plaintiffs and the defendants simply to litigate the issue upon resumption of the trial."  Id. at 1179.

Drawing on a phrase from the Preamble of the consent decree – that the decree constituted the "final and complete resolution of all class issues" – the court nonetheless concluded that "both the plaintiffs and the [Department] agree[d] that the decree should not be read as silent on the liability issue."  Id. (emphasis in original). The liability issue had been settled; the plaintiffs had made out a case for

21

class-wide liability, and the Department had consented to the entry of a decree abolishing the Department's allegedly discriminatory employment and promotion policies.[16]  In the court's view, the Department's agreement that the plaintiffs did not have to offer further proof of discrimination in order to obtain the class-wide relief the decree provided constituted an admission that the Department had discriminated against the plaintiff classes as alleged in the complaint.  The court expressed this point in its March 18, 1998 order:  the Department's agreement to the relief afforded by the consent decree "[could not] be logically interpreted as anything other than as an extensive effort to redress existing class-wide discrimination."  Id. at 1182.

This admission, of course, did not answer the question whether the Department had conceded that it was liable to the individual class members for the relief they were seeking – instatement or promotion and/or back pay.  To answer that question the court took the following approach.  First, it concluded that the phrase "final and complete resolution of all class issues" in the decree's Preamble

---

[16] The court read the Department's position on post-consent decree liability as this:  all that remained to be litigated were the claims of the individual class members for instatement or promotion, and back pay.  To prevail on their claims, the class members would have to satisfy the McDonnell Douglas test by demonstrating that (1) they belonged to a protected class; (2) they were subject to an adverse job decision; (3) the employer treated similarly situated employees outside their classification more favorably (i.e. a white was hired or promoted instead); and (4) they were was qualified to do the job. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).

22

is ambiguous.  Having drawn that conclusion, the court turned to several pieces of extrinsic evidence to resolve the ambiguity.  They included: (1) a paragraph in the notice sent to the plaintiff class members (prior to the entry of Consent Decree I) which indicated that the case would advance to the "remedies" stage if the decree were approved and entered;[17] (2) statements made by the Department's counsel after the trial resumed in September 1997 (five months after the court entered the $34 million judgment for back pay); (3) the presence of an express disclaimer of liability in the consent decrees the parties proposed in 1988 and 1991 (which the court rejected), and lack of an express disclaimer of liability in Consent Decree I; and (4) plaintiffs' counsel's representation that, while negotiating the terms of Consent Decree I, the Department's attorneys conceded that the Department had discriminated against the plaintiff classes as alleged in the complaint.[18]

After considering these pieces of evidence, the court found that the phrase "final and complete resolution of all class issues" meant that the Department's

---

[17] A subsequent paragraph in the notice indicated that the remedies stage would involve separate trials of the individual class members' possessive claims for relief:
> The proposed Consent Decree, by itself, does not guarantee that any particular member of the class will be entitled to back pay or front pay, but it also does not limit the amount of such relief to which any class member may be entitled in the future proceedings to be held on that phase of the case.

[18]  Plaintiffs' counsel made these representations to the district court on several occasions – in their pleadings, in their memoranda filed in support of their pleadings, and in the well of the courtroom.  They made the same representations to this panel, during oral argument, and in a post-argument submission the panel requested.

hiring and promotion policies, as implemented, had discriminated against all three plaintiff classes as alleged in the complaint, and warranted not only the prospective injunctive relief the consent decree provided, but the relief the individual class members were claiming as well. The court went on to find that even if this evidence did not establish such global liability, the August 28 Report rendered the Department liable to the merit employee class for back pay because, in that report, the Department agreed to a framework for a back pay formula.[19] In effect, such agreement constituted a settlement of the back pay claims of the merit class members.

We cannot accept the district court's conclusions that the consent decree established that the Department had discriminated against the members of the three plaintiff classes and, therefore, was liable for the class-wide prospective relief the decree granted and relief the individual class members were seeking. Finally, we cannot accept the contention that the August 28 Report rendered the Department liable for the back pay the court awarded the merit employees on April 16, 1997. We state our reasons below.

_____

[19] The court concluded that, in agreeing to the framework for a formula, the Department conceded liability; thus, "even in the absence of a class-wide liability finding under the consent decree, the court would still find class-wide liability under the formula." Reynolds, 996 F. Supp. at 1186. Presumably, the pieces of evidence cited in (1)-(4) above buttressed the court's finding.

1.

The district court concluded that, by inserting the phrase "final and complete resolution of all class issues" into the Preamble of the consent decree, the parties intended that "the decree should not be read as silent on the liability issue." Such an intent does not logically follow from the quoted phrase. What the phrase obviously means is that the consent decree finally and completely resolved the plaintiffs' claims for prospective class-wide injunctive relief abolishing the Department's allegedly discriminatory practices. The Department's acknowledgment that, upon the entry of the decree, it became unnecessary for the plaintiffs to offer further proof in support of their claims for class-wide relief – which the court treated as an admission by the Department that it had engaged in the discriminatory practices alleged in the complaint – was an obvious consequence of the parties' settlement of those claims. A defendant who consents to the entry of an injunction (or other form of judgment) does not <u>necessarily</u> agree that it has committed the wrongful acts alleged in the plaintiff's complaint. Common practice is that defendants who consent to the entry of injunctive orders do so without admitting liability. <u>Cf.</u> <u>Dennis v. County of Fairfax</u>, 55 F.3d 151, 154 (4th Cir. 1995) (stating that, although parties agree to be bound to the remedies in consent judgments, "in electing such a remedy, they generally admit nothing in

25

the way of guilt."). If every consent decree constituted an admission of liability, defendants would have little incentive to settle the case.

2.

In addition to concluding that the Preamble phrase "final and complete resolution of all class issues" constituted an admission by the Department that it had engaged in racially discriminatory employment practices (thus warranting the class-wide injunctive relief provided by the consent decree), the district court also held that the phrase meant that the Department had discriminated against the individual class members. Thus, all the members of the merit-employee class (the recipients of the money judgment now before us) had to show in order to recover was the difference between what they and similarly situated white employees were paid. This holding is flatly inconsistent with the parties' agreement that, absent settlement, each class member (including the members of the merit-employee class) would have to establish entitlement to relief in post-decree proceedings before the court.

The Preamble phrase is repeated practically <u>verbatim</u> in Article 19, which states that the class-wide relief provided by the decree "constitutes full and complete relief on all claims." Both the Preamble and Article 19 are "subject to the provisions of this Decree providing for further proceedings, including but not

26

limited to Article[] 20." Article 20 states that "[f]urther negotiations and proceedings are required to resolve the claims for monetary and non-monetary remedies for individual members of the class[es]. . ., provided however, that <u>this Decree does not in and of itself entitled [sic] any such class member to such remedies</u>" (emphasis added). At the fairness hearing held to consider Consent Decree I, the court emphasized this point in a colloquy with plaintiffs' counsel regarding the claim of Wayne Leonard, a member of the merit-employee class:

> THE COURT: [The consent decree] does not require any back pay?
>
> [PLAINTIFF'S COUNSEL]: No, it only requires that Mr. Leonard's back pay be calculated in stage two of this case, under article–
>
> THE COURT: That assumes he prevails in Stage 2.
>
> [PLAINTIFF'S COUNSEL]: Yes, sir. No–yes, it assumes that the parties either agree on or that he's been a victim of some racially discriminatory practice or the Court finds that, yes sir.
>
> . . . .
>
> [PLAINTIFF'S COUNSEL]: . . . [I]t is my belief that the decree affords [Mr. Leonard] all of the relief that he would be entitled to receive except the issue of back pay which would be reached in the next phase of the case.
>
> THE COURT: What you're saying in effect is that the–any claim he may have to individual relief is still available to him?
>
> [PLAINTIFF'S COUNSEL]: Yes.
>
> THE COURT: If he can prove his case.
>
> [PLAINTIFF'S COUNSEL]: Yes, completely.

27

THE COURT: Well, this decree in no way cuts off his right to come forward with evidence of racial discrimination. If he has it, he will prevail, if he doesn't, he'll lose. That option is still open.

[PLAINTIFF'S COUNSEL]: Yes. In Stage 2, he will be given the opportunity to show that he's been an individual victim.

Plaintiff's counsel thus represented to the court in these statements that, after entry of the consent decree, the individual class members had the burden of proving their respective claims. Given this representation, the district court's statements to counsel, and the provision of Article 20 cited above, we reject the notion that the Preamble phrase rendered the Department liable for the relief the individual class members are seeking.

3.

Notwithstanding these provisions of Articles 19 and 20, and its statement to counsel concerning what Wayne Leonard would have to prove to prevail on his claim, the district court held that several pieces of extrinsic evidence showed that the phrase "final and complete resolution of all class issues" indicated that the Department had conceded liability to the individual class members for the relief they were seeking. The court considered this extrinsic evidence because it viewed the phrase as ambiguous. This evidence included (1) the statement in the class notice that the next stage of the case would be the "remedies" stage; (2) statements

28

the Department's counsel made after the trial resumed; (3) the absence in Consent Decree I of the express disclaimer the parties had inserted in earlier settlement proposals; and (4) plaintiffs' counsel's representation that the Department's attorneys had admitted liability during the parties' negotiations over the terms of Consent Decree I.

We assume for sake of discussion that the phrase "final and complete resolution of all class issues" is ambiguous, and that the court was justified in attempting to resolve that ambiguity. To resolve the ambiguity, the court was required to employ the principles governing the interpretation of contracts.

As in the case of an ambiguous contract provision, if a provision of a consent decree is ambiguous, the court looks to extrinsic evidence to determine the parties' intent. Cf. United States v. Insurance Co. of N. Am. 131 F.3d 1037, 1042 (D.C. Cir. 1997) (ambiguous contract). The best evidence of the parties' intent is not what the parties or their lawyers may have said to one another – as to the meaning of the phrase – long after the consent decree is entered. First and foremost, the court should look to what the parties or their lawyers said to one another in fashioning the decree. See Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999) (noting that contract negotiations between the parties is at the top of the "descending order of importance" of admissible extrinsic evidence).

29

Next, to determine the meaning of a provision, the court might look to a prior course of performance, a prior course of dealing, or usage of trade.[20] See Restatement (Second) of Contracts § 202(5) (1981). If none of these tools resolve the ambiguity, and the meaning of the provision is in equipose, the court may utilize accepted presumptions, including resolving the ambiguity against the party that drafted the instrument, cf. Anderson v. Auto-Owners Ins. Co., 172 F.3d 767, 769 (11th Cir. 1999) (applying Florida law), or, in the case of a contract of adhesion, resolving the ambiguity in favor of the adhering party, cf. Wheelock v. Sport Kites, Inc., 839 F. Supp. 730, 736 n.6 (D. Haw. 1993) (applying Hawaii law), or in favor of a party without sophisticated legal assistance, cf. Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.–East, 377 F. Supp. 418, 423 (C.D. Cal. 1974) (applying California law), rev'd in part on other grounds, 542 F.2d 1053 (9th Cir. 1976). See generally 17A Am. Jur. 2d Contracts §§ 346-47 (1991). If none of these means of discerning the parties' intent resolves the ambiguity, the court has no choice "but to leave the parties where it found them." 4 Williston on Contracts § 627 (3d ed. 1961) (citing the classic English case of the two "Peerless" ships, Raffles v. Wichelhaus, 2 Hurlst & Colt. (Eng) 906).

---

[20] Neither this type of evidence nor any of the tools indicated in the following text are applicable in the context of the instant case.

Each of these methods of discerning intent involves an examination of circumstances antecedent to the formation of the contract or consent decree. Self-serving statements made after the contract is formed – or the consent decree is entered – as to what a given provision means are verboten. Accordingly, the district court should not have considered item (2), the statements the Department's attorneys made after the trial resumed (and several months after the consent decree was entered).[21] We turn, then, to items (1), (3), and (4).

The district court found significant, in item (1), that the class notice mentioned "remedies" as the next stage of the litigation once the court entered the decree. In other words, the court concluded that the Department, by agreeing to the class notice, was telling each class member that, once the court entered the decree, the member would be entitled to an individual remedy (instatement, promotion and/or back pay) without having to prove that he or she was a victim of racial discrimination. The reference to "remedies," however, when read in conjunction with the Article 20 provision quoted above, shows only that the parties contemplated "further proceedings." In fact, the class notice, paraphrasing Article

_____

[21] The principal statements (by Department counsel) that the district court cited were that, in order to recover, each class member would have to establish a prima facie case of liability as required by the McDonnell Douglas test, Reynolds, 996 F. Supp. at 1180, n.88, and that the class member could not rely on the disparate impact theory of liability, id. at 1182-83. Neither of these statements sheds light on the meaning of the phrase "final and complete resolution of all class issues."

31

20, stated that Consent Decree I, by itself, "does not guarantee that any particular member of the class will be entitled to back pay."[22] Item (1) thus did nothing to resolve the ambiguity the district court found.

Item (3) is similarly unavailing. That earlier settlement proposals contained an express disclaimer of liability while Consent Decree I is silent on the point does not yield permissible inferences that the Department admitted that its employment and promotion practices were discriminatory and that it had actually discriminated against every member of the plaintiff classes because of race.[23] The latter inference is impermissible because Article 20 explicitly informed the class members that no individual relief would be forthcoming absent proof that racial discrimination motivated the Department's employment or promotion decision. The former inference is impermissible because an admission of liability concerning the Department's employment and promotion practices was unnecessary given the Department's agreement to Consent Decree I's class-wide relief.

This brings us to item (4), plaintiffs' counsel's representation that, while negotiating the terms of Consent Decree I, the Department's attorneys admitted

---

[22] See supra note 17.

[23] We use the phrase "permissible inferences" to indicate probable, as opposed to possible, inferences; that is, inferences established by a preponderance of the evidence. Almost any inference is possible.

that the Department had discriminated against the members of the plaintiff classes on account of their race and thus were liable for the relief being sought.

Typically, as we have noted, what the parties or their lawyers say while negotiating the terms of a contract may be highly probative of the meaning of an ambiguous provision in their agreement.  Federal Rule of Evidence 408, however, provides an exception for statements relating to liability made during settlement talks.  Rule 408 states, in pertinent part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.[24]

Absent this exception, the district court acted properly when it considered the statements the Department's attorneys made to plaintiffs' counsel as to the meaning of the phrase "final and complete resolution of all of the class issues."

---

[24] In other words, while normally a court may use as evidence statements made during negotiations to interpret ambiguous gaps in consent decrees, Rule 408 precludes such evidence to "prove liability for or invalidity of [a] claim or its amount."  This is entirely consistent with the common law rule that judgment may only be entered when an admission of liability by a defendant is "distinct, unequivocal, and unconditional."  49 C.J.S. Judgments § 193(a) (1997).  See also Backar v. Western States Producing Co., 547 F.2d 876, 880 n.4 (5th Cir. 1977) (holding that judicial admissions must be "deliberate, clear, and unequivocal").

33

But because of the 408 exception, plaintiffs' counsel's representation of what the Department's attorneys said in the course of negotiating the terms of Consent Decree I about the legality of the Department's employment and promotion practices was inadmissible, and the court should not have considered it.[25]

In sum, even if the phrase at issue is considered ambiguous, the district court had no admissible evidence before it with which to resolve the ambiguity. Accordingly, the court should have left the parties where it found them, with the issue of the Department's liability – as to the classes or the individual class members – unresolved. This having been said, we return to our earlier holding; that is, that the phrase "final and complete resolution of all class issues" is unambiguous.

4.

Putting aside the question whether the "final and complete resolution" phrase is ambiguous, the district court concluded that the members of the merit-employee class were entitled to back pay because the Department effectively admitted liability for such pay by agreeing, in the August 28 Report, to a formula for determining back pay. In essence, the court found that, by jointly filing the

---

[25] The obvious teaching of Rule 408 is that parties negotiating consent decrees should not use ambiguous language when drafting provisions relating to the issue of liability.

34

August 28 Report with the court, the Department and the plaintiffs settled the back pay issue for the merit-employee class.

The court's conclusion is erroneous, and we accordingly disregard it, for two reasons. First, nothing in the report could reasonably be construed as the Department's admission of liability for the back pay the court subsequently awarded. Second, in submitting the report, the Department was simply following the court's command – that the parties negotiate a "formula" for determining back pay. As it turned out, the parties were able to agree on a framework for a formula; they disagreed, though, as to precisely what the formula should be. Because the court had nothing before it on which to base its holding of liability on the back pay issue, we need not decide whether the Department's concession in the August 28 Report  if, indeed, that is what it was – is inadmissible under Rule 408, because it related not only to liability but also damages. There can be little doubt that whatever the Department did was done in a court-ordered effort to arrive at a compromise on either or both of those issues.

## III.

For the reasons we have given, we vacate the district court's determination that Consent Decree I operated as an admission, and therefore an adjudication, of

35

the Department's liability as to both the class claims for prospective injunctive relief and the class member's claims for individual relief. We also vacate the judgment for back pay the court awarded the members of the merit-employee class. Finally, we remand the case for further proceedings.

With the exception of the prospective injunctive relief Consent Decree I has provided, the paths the parties have followed in litigating this case have led to nothing but the expenditure of time and considerable resources. For the most part, counsel have simply engaged in shadow boxing – all at the expense of the taxpayers of the State of Alabama and other litigants whose cases are awaiting the district court's attention. We therefore consider it necessary to explain the present posture of this case and what remains to be litigated.

First, the prospective injunctive relief provided by Consent Decree I remains undisturbed. Second, that decree did not adjudicate the Department guilty of anything.[26] Third, as Article 20 of the decree states, in order to obtain individual

---

[26] The district court, in its order of March 18, 1998 (explaining the court's ruling that Consent Decree I established Department liability for the unlawful conduct alleged in the complaint), held that the post-decree stage was controlled by Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir.1974) (Pettway III). This is not a Pettway case. In Pettway, the district court, following a trial on the allegations of the plaintiff classes (black job applicants and employees) that the employer's hiring and promotion decisions were being made on the basis of race, held in favor of the plaintiffs. The case then moved to the remedies stage, and the question before the former Fifth Circuit dealt with the extent to which the class members could use the district court's finding of class-wide discrimination in proving their individual claims of discrimination. Here, because the parties settled the plaintiffs' claims for prospective relief (concerning the hiring and promotion criteria the Department should use), there is no adjudication that the Department

36

relief, the members of the three plaintiff classes must prove that the Department discriminated against them on account of their race when it failed to hire or promote them (to a higher position, in the case of the merit employees, or to merit status, in the case of the non-merit employees). A member will establish a prima facie case of racial discrimination if he or she satisfies the McDonnell Douglas test. If it appears that, as a matter of policy or practice, the Department's hiring or promotion decisions were based on race, a class member may rely on such fact in countering the Department's lawful excuse for not hiring or promoting the member.[27]

discriminated against the plaintiff classes on the basis of race in deciding whether to hire or promote.

[27] Whether the Department followed a discriminatory policy in deciding whether to hire or promote a person is an issue that may be susceptible to resolution in a consolidated proceeding involving representative members of each of the three plaintiff classes, so that the findings of fact yielded by such proceeding would operate as collateral estoppel in the litigation of the individual class members' claims under the framework provided by McDonnell Douglas. See Gulf Tampa Drydock Co. v. Germanischer Lloyd, 634 F.2d 874, 877 n.4 (5th Cir. 1981) (stating that collateral estoppel "would 'preclude a party from relitigating an issue decided against him in a prior action, even if the party asserting the estoppel was a stranger to the prior action . . . unless it appears that the party against whom the estoppel is asserted [did not have] a full and fair opportunity to litigate the issue in the prior proceeding and that application of the doctrine [would] result in an injustice.' ") (quoting Rachel v. Hill, 435 F.2d 59, 62 (5th Cir. 1970)).

We emphasize that a finding, in such consolidated proceeding, that the Department implemented a racially discriminatory policy, would not necessarily create an inference that a given class member was denied employment or a promotion because of race. That is, a finding that the employer has been discriminating against job applicants and employees does not, standing alone, entitle a person to relief; other facts must be present – including that the person seeking relief was qualified for the position in question – if that person is to carry the day. In Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974) (Pettway III), which we discuss in the

SO ORDERED.

---

previous footnote, the district court found, after a full trial on the merits, that the defendant essentially froze all of its black employees in less desirable positions by using testing requirements unrelated to business necessity.  See id. at 217-43.  The former Fifth Circuit held that those facts supported a "reasonable inference" that an individual member was the victim of discrimination.  Id. at 260.

In the instant case, it is undisputed that the Department hired thousands of blacks; these black employees, in fact, make up the merit and non-merit classes of employees.  It is also clear that the Department promoted some members of the merit-employee class and gave some members of the non-merit employee class merit status. In light of this, there can be no inference that the Department's policies and practices injured every member of the plaintiff classes by discriminating against him or her on account of race.  It is for this reason that, in litigating an individual class member's case, the establishment of the facts that give rise to a McDonnell Douglas presumption of discrimination is important.