[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-14183
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 22, 2011
JOHN LEY
CLERK

D.C. Docket Nos. 09-20526-CV-ASG, 09-20657 CV-ASG

KLAUS HOFMANN,
an individual,

Plaintiff-Appellee,

versus

DE MARCHENA KALUCHE & ASOCIADOS,
a foreign corporation,
ENRIQUE DE MARCHENA,
an individual,
EMI SUN VILLAGE, INC.,
HSV HOTELS DE OPERADORA, S.A.,
EMI RESORTS MANAGEMENT, S.A.,
EMI RESORTS MANAGEMENT (S.V.G.), INC.,
EMI COFRESI DEVELOPMENTS, INC.,
KAHEBRAMS, S.A.,
a foreign corporation,
EMI MANAGEMENT, INC.,
a foreign corporation,
SUN VILLAGE JUAN DOLIO, INC.,
PROMOTORA XARA, S.A.,
a foreign corporation,
ELLIOTT MICHES HOLDINGS, INC.,
a foreign corporation, et al.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(September 22, 2011)

Before CARNES, KRAVITCH, and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

Klaus Hofmann joined a suit alleging violations of state and federal RICO laws against Frederick Elliot, Elliott's various companies, including EMI Resorts, Inc., and Elliot's legal counsel, Enrique de Marchena and his firm De Marchena, Kaluche & Asociados (collectively "DMK"). EMI Resorts and DMK appeal the district court's entry of an agreed order appointing a receiver-like "monitor" to oversee the defendants' financial and business assets. The defendants seek to vacate the district court's order on the ground that it failed to accurately reflect the substance of the parties' agreement concerning the authority of the "monitor." DMK also appeals its inclusion by the district court among the parties agreeing to waive jurisdictional objections to the proceedings.

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

Because the appellants fail to demonstrate facts sufficient to nullify their consent to the district court's appointment of the "monitor" and to its waiver of jurisdictional objections, we decline to vacate the district court's order.

**BACKGROUND**

Elliott is a former Canadian citizen now residing in the Dominican Republic where he owns and operates numerous real estate and investment companies, including EMI Resorts. Hofmann is a resident of Florida and owner of several investment products sold by Elliott and his companies. In his complaint, Hofmann alleges that Elliott and his legal counsel, DMK, engaged in a scheme using Elliott's companies to defraud Hofmann and other real estate investors of over $170 million.[1] Hofmann also sought an injunction to prevent the defendants from diverting or selling their business assets during the litigation and asked the district court to appoint a receiver to manage those assets. Instead of appointing a receiver, the district court appointed special master Thomas Scott to help the parties agree on a way to preserve the defendants' assets during the litigation while also maintaining the defendants' independent control over them.

---

[1] Another plaintiff, Aureilo Aguilar, also brought suit against the defendants. While Aguilar and Hofmann both sought the appointment of a receiver, Aguilar later voluntarily dismissed his suit.

At a July 14, 2009 hearing before the district court, Scott proposed the appointment of a different special master to oversee the defendants' asset management decisions as an alternative to a receiver. Present at this hearing were counsel for the plaintiffs and Carlos Concepcion, who stated his appearance as counsel on behalf of all defendants except Aviati, DC Communication Construction Services and Victor Cabral. Also present was Jesus Almanzar, a partner of Enrique de Marchena. De Marchena himself attended the hearing via teleconference.

After Scott proposed his alternative, the district court recessed while Scott discussed his proposal with the parties. Upon returning, and after another recess, Scott produced a one page memorandum that described the overseeing special master and its authority. In pertinent part, the memorandum stated that Elliott, "on behalf of himself and all Defendant companies," agreed to provide an overseeing "Special Master" timely reports concerning his investments. This special master would have "full access" to the financial records and assets of Elliott and his Defendant companies, and these parties could take "no actions" without the special master's consent. If Elliott and his Defendant companies failed to comply with these requirements, the district court would appoint a receiver. In order to facilitate the domestication of this special master in the Dominican Republic, the parties added a

handwritten stipulation that the "Defendants" would "drop all jurisdictional issues [and] FNC [forum non conveniens] questions."

Scott indicated to the district court that all parties agreed to this proposal in lieu of receivership. After explaining the memorandum, Scott stated "maybe we can have each party initial the memo, at least for tonight, and then what I propose is that each side can submit within 24 hours a proposed order with this contemplated and then we will meet and confer and submit the order." Elliott signed the memorandum on behalf of himself and as an authorized representative of the "Elliott Defendants." Hofmann's counsel also signed the memorandum, as did Scott and Concepcion.

No further meeting between the parties took place after the July 14, 2009 hearing. Instead, one day later, Hofmann submitted to Scott the plaintiffs' proposed order appointing the agreed-upon special master over the defendants' assets. Also on July 15, 2009, Concepcion filed a proposed order on behalf of all the defendants.

On July 17, 2009, the district court entered an order appointing Scott as "monitor" over the "Elliott Defendants" and their financial and business affairs. The district court included both DMK and EMI Resorts among the Elliott Defendants, and premised its order upon "the recommendation of the Special Master, and the parties' agreement, as announced in open court and memorialized in the memorandum signed by the Special Master." The district court's order specified the authority of the

5

monitor and the responsibilities of the Elliott Defendants. The order also stated that the Elliott Defendants, again including DMK, agreed to withdraw their motions challenging personal jurisdiction and forum non conveniens.

In response, both DMK and Elliott filed motions requesting the district court to reconsider its order. DMK argued that it never consented to the appointment of the monitor or to the waiver of its jurisdictional objections, and EMI Resorts argued that the district court's order simply created a receiver by another name. While the district court denied both motions to reconsider, DMK and EMI Resorts do not appeal these denials. Instead, both DMK and EMI Resorts directly appeal the district court's initial July 17, 2009 order to this court.

**DISCUSSION**

A. Standard of Review

The district court explicitly based its July 17, 2009 order upon the existence and substance of an agreement between the parties. Defendants, then, assert that the interpretation of agreed orders like this one should be reviewed <u>de</u> <u>novo</u>, according to principles of contract law. <u>See</u> <u>Reynolds v. Roberts</u>, 202 F.3d 1303, 1312-13 (11th Cir. 2000). There is no interpretation of the district court's order, however, that forms the basis of this appeal. Rather, DMK and EMI Resorts directly appeal the district court's agreed order itself.

6

As a general rule, a party has no standing to appeal an order or judgment to which he consented. Id. at 1312 (citing 5 Am. Jur. 2d Appellate Review § 619 (1995)). A party may appeal such an order, however, if the order allegedly deviates from the terms of the parties' agreement, or was never consented to in the first place. See id.; Dorse v. Armstrong World Industries, Inc., 798 F.2d 1372, 1375 (11th Cir. 1986) (quoting Swift & Co. v. United States, 276 U.S. 311, 314 (1928)).

Under the law of this circuit, it is unclear how closely we should scrutinize a district court's formulation of a consent order on appeal. In Shores v. Sklar, we noted that parties consenting to an order lack standing to appeal it, "unless they can show facts that would justify nullifying the consent." 885 F.2d 760, 764 n.7 (11th Cir. 1989) (en banc). Other circuits also require that a party demonstrate "facts to nullify their consent" when appealing consent orders. See Yoder Bros., Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1363 (5th Cir. 1976); Thonen v. Jenkins, 455 F.2d 977 (4th Cir. 1972) (per curiam). Accordingly, we focus our review in this case upon whether the defendants have sufficiently demonstrated facts showing either that the district court's order deviated from the substance of their July 14 agreement or that no consent existed for it in the first place.

B. DMK's Consent to the District Court's July 17, 2009 Order

DMK argues that neither De Marchena himself nor his firm ever consented to the memorandum agreement at the July 14 hearing and that, as a result, the district court's July 17 order should not bind DMK. In doing so, DMK argues that Almanzar, DMK's representative, was present at the July 14 hearing and neither signed Scott's memorandum nor otherwise assented to the agreement it reflected. Also, DMK argues that, because it is not one of Elliott's "Defendant companies," the substance of Scott's memorandum did not concern DMK. Finally, DMK argues that the district court's later adoption of a report and recommendation excluding DMK from the "Elliott Defendants" suggests that DMK should not be considered as one of the parties to the July 14 agreement.

These facts, however, are insufficient to nullify DMK's consent to the district court's July 17 order. First, it was Concepcion who bound DMK to the parties' agreement at the July 14 hearing. DMK is correct in that its own representative was present–and even spoke–at the hearing. At the beginning of the hearing, however, the district court asked counsel to note their appearances for the record. With the exception of three unrelated parties, Concepcion identified himself as counsel on behalf of all defendants, including DMK. Neither Almanzar nor De Marchena ever objected to Concepcion's doing so. And, with the exception of scheduling matters, Concepcion was the only counsel to speak for the defendants throughout the hearing.

8

Concepcion's signature on Scott's memorandum agreement, then, bound DMK as much as it did any other defendant present at the July 14 hearing.

Second, Scott, the parties and the district court all appeared to view Scott's entire proposal as applying to all of the defendants. The district court addressed all of the defendants when asking that they waive any jurisdictional objections to the proceedings. It stated, "I cannot continue to have Master Scott seriously involved in this matter if the defendants are contesting my jurisdiction." Similarly, when asking the parties to consider the appointment of a monitoring special master, the district court stated that "I want an answer from both sides," evidently lumping DMK and Elliott together. Scott, upon returning from the second recess, told the district court, "the memo as I've indicated has been signed by all four parties." By failing to object or seek clarification as to which parties the various terms of the agreement applied, DMK gave the impression that it had consented to the entirety of the parties' July 14 agreement.

Third, and finally, DMK's exclusion from the Elliott Defendants in Scott's August 10 report and recommendation has no bearing on the parties' July 14 agreement. In this report and recommendation, Scott recommended that a manager be appointed over the Juan Dolio and Cofresi properties and the "Elliott Defendants." Scott identified the "Elliott Defendants" according to the term's usage in the district

9

court's July 17 order, "with the exception of Enrique De Marchena, [and] the law firm of De Marchena Kaluche & Asociados." DMK's exclusion, however, does not mean that the district court's July 17 order should not have applied to DMK. Rather, this exclusion only means that Scott's report and recommendation, by contrast, does not. In this context, the facts argued by DMK are insufficient to nullify DMK's consent to the entire July 14 agreement and the district court's subsequent order.

C. The District Court's Deviation from the July 14 Agreement

DMK argues that, if bound to the parties' July 14 agreement, the district court's subsequent monitor order does not accurately reflect the substance of that agreement. EMI Resorts similarly argues that the authority of the monitor as appointed by the district court exceeds the authority agreed to by the parties. EMI Resorts fails to point to any specific difference (other than page length) between Scott's proposal and the district court's July 17 order. DMK points to paragraphs 2(a), 5(a), 7, 12 and 20 as provisions where the monitor's authority exceeds anything agreed to by the parties.

These provisions permit the monitor to "examine, review and monitor the business affairs, funds, assets" and other property of the Elliott Defendants (¶2(a)); to "investigate any and all transfers of monies, property, assets, [and] records" that the monitor believes was wrongfully transferred by the Elliott Defendants (¶5(b)); and to have "unfettered access" to all accounts at any "bank, brokerage firm, [or] financial

10

institution" holding assets or funds of the Elliott Defendants (¶7). These provisions also require that the Elliott Defendants "shall take no action" where its impact shall have a value of greater than $10,000 (¶12) and may not transfer or dispose of any asset worth greater than $5,000 without the consent of the monitor (¶20).

Like before, however, these facts are insufficient to nullify the defendants' consent to the district court's order appointing a monitor. It is evident that Scott's memorandum did not exclusively represent the agreement between the parties. Referring to Scott's memorandum at the July 14 hearing, the district court stated that "I think some things have to be spelled out with a little more specificity." Hofmann's counsel later observed that the memorandum would "serve as the foundation for a more detailed order." Scott himself asked the parties to draft proposed orders with the memorandum contemplated. Any literal difference, then, between Scott's memorandum and the district court's order cannot be a basis for the order's vacation.

Further, and more importantly, the terms of Scott's memorandum represent the substance of the monitor order's provisions identified by DMK. The memorandum's language, perhaps because of its brevity, is considerably broader than anything in the district court's order. For example, Scott's memorandum requires that the defendants provide "immediate, full access to the Special Master . . . to any and all financial records and assets." Scott's memorandum also requires that "no action will be taken

without the advice and consent of the Special Master." These two provisions in Scott's memorandum encompass the authority granted by the district court's July 17 order. As a result, the defendants demonstrate no meaningful difference between the parties' July 14 agreement and the district court's subsequent order appointing a monitor. Accordingly, neither EMI Resorts nor DMK can demonstrate any fact sufficient to nullify their consent to the district court's July 17 order.

**AFFIRMED.**