**Johnny REYNOLDS, et al., Plaintiffs,**

v.

**ALABAMA DEPARTMENT OF TRANSPORTATION, et al., Defendants.**

No. CIV.A. 85–T–665–N.

United States District Court, M.D. Alabama, Northern Division.

Aug. 29, 2001.

See also, 202 F.3d 1303 and 207 F.3d 1288.

OPINION

MYRON H. THOMPSON, District Judge.

In 1994, this longstanding lawsuit—in which the plaintiffs, who represent African–American employees and applicants, charged the defendants, the Alabama Department of Transportation, the Alabama State Personnel Department, and their officials, with racial discrimination in employment—resulted in a partial consent decree, called consent decree I, settling what all parties agreed were race-neutral class-wide issues. *See Reynolds v. Alabama Dep't of Transp.,* 1994 WL 899259 (M.D.Ala. Mar.16, 1994) (Thompson, J.).[1] A group of white and other non-African-American employees, called the Adams intervenors, were allowed limited intervention to represent the interests of non-black employees in the consent decree. On January 31, 2000, the plaintiffs, the Adams intervenors, and the defendants entered into an agreement on contempt for the defendants' continuing failure to comply with various aspects of this decree. *Reynolds v. Alabama Dep't of Transp.,* 84 F.Supp.2d 1339 (M.D.Ala.2000) (Thompson, J.).[2]

This matter is currently before court on two class-wide settlement agreements that address many of the issues that have aris-

---

1. Doc. no. 553

2. Doc. no. 4284.

en out of consent decree I and the January 2000 contempt order. One settlement is between the plaintiffs and the defendants, which the court will refer to as the plaintiffs' settlement; it provides for both monetary (up to $ 59.6 million) and non-monetary relief. The other is between the Adams intervenors and the defendants, which the court will refer to as the intervenors' settlement; it also provides for both monetary ($ 8.35 million) and non-monetary relief. Specifically, the following five motions, relating to the two proposed settlements, are pending: (1) the plaintiffs and the defendants' joint motion and stipulation concerning approval of proposed settlement, filed January 16, 2001;[3] (2) the defendants' motion for modification of the January 2000 contempt order, filed June 5, 2001;[4] (3) the plaintiffs' supplement to motion to approve settlements for further relief, or modification of the January 2000 contempt order, filed June 5, 2001;[5] (4) the Adams intervenors and defendants' motion and stipulation concerning approval of proposed settlement agreement, filed April 13, 2001;[6] and (5) the Adams intervenors and defendants' joint motion, in the alternative, for modification, filed June 12, 2001.[7]

A fairness hearing on the two pending settlements was held on May 29, 2001, at which time objections to each settlement were heard by the court. Following the fairness hearing, the court conducted three weeks of evidentiary hearings during which the parties put forth expert and factual witnesses on issues related to testing, training, job rotation, and the interim selection procedures.[8] The court fully appreciates the time and expense the parties have put into the proposed settlements; and the court, as much as the named parties, class members, and their attorneys, longs for the day when this litigation will come to an end (at least, in some of its major parts). Nevertheless, the court finds, in particular, in light of recent directives from Eleventh Circuit Court of Appeals in *Reynolds v. Roberts*, 202 F.3d 1303 (11th Cir.2000) (*"Reynolds I"*), *Reynolds v. Roberts*, 207 F.3d 1288 (11th Cir. 2000) (*"Reynolds II"*), *cert. denied*, 533 U.S. 941, 121 S.Ct. 2576, 150 L.Ed.2d 739 (2001), and *Reynolds v. Roberts*, 251 F.3d 1350 (11th Cir.2001) (*"Reynolds III"*), that both settlements are due to be rejected.

## I. BACKGROUND

Although the history of this heavily litigated case has been described elsewhere, it is almost impossible to address any substantive issue now pending without setting the proper context. This is particularly true for the two settlements because of the court's ultimate conclusion that neither can be approved in light of the appellate mandates in this case. Accordingly, the court begins its discussion with a review of highlights of the *Reynolds* litigation, giving particular emphasis to the three appellate decisions issued by the Eleventh Circuit

---

3. Doc. no. 4700.

4. Doc. no. 5038.

5. Doc. no. 5040.

6. Doc. no. 4923.

7. Doc. no. 5059.

8. During these three weeks of hearings, the court also heard evidence and argument on other pending and related motions. *See* Defendants' motion to approve hiring, filed March 2, 2001 (Doc. no. 4830); show cause order filed March 5, 2001 (Doc. no. 4831); plaintiffs' motion to modify order (Doc. no. 4831) to show cause regarding interim appointments, filed March 5, 2001 (Doc. no. 4845); show cause order, filed March 6, 2001 (Doc. no. 4846); Adams intervenors' motion for further contempt relief and for modification, filed January 8, 2001 (Doc. no. 4691). The court will address these matters separately and later.

Court of Appeals in *Reynolds I, Reynolds II,* and *Reynolds III.* The court will then review the pending matters to explain the terms and operation of the pending settlements and how the settlements and pending motions both complement and contradict one another.

### A. History of the Case

#### 1. Consent Decree I

The named plaintiffs brought suit against the Alabama Department of Transportation, the Alabama Personnel Department, and others in 1985 on behalf of all African–American merit and non-merit employees of the department, all former African–American employees, and all unsuccessful African–American applicants for positions in the Transportation Department. This lawsuit was brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17, 42 U.S.C.A. § 1981, and the equal protection clause of the fourteenth amendment. The alleged discrimination consisted of (1) using non-job related criteria that had the effect of precluding blacks from being hired or promoted; (2) prohibiting black employees from gaining the job experience necessary for promotion; and (3) granting promotions and pay increases to white employees who were less qualified than their black employees. In October 1986, the court certified three plaintiff classes. The first class consisted of any African American who unsuccessfully applied for a merit position in the Transportation Department at any time after May 21, 1979. The second class included all African Americans employed by the department at any time after May 21, 1979, who were permanent employees under the merit system and thus eligible for promotion. The third class consisted of those African Americans employed by the department after May 21, 1979, as temporary, "non-merit" employees who applied for merit positions but were rejected, allegedly because of their race.

After a period of discovery, the parties entered into settlement negotiations. In 1988 and 1991, the parties presented proposed consent decrees to this court for approval. On each occasion, some members of the plaintiff classes objected, and the court sustained the objections and refused to enter the decrees. In June 1992, the case went to trial. Near the end of the plaintiffs' case, the parties asked for an indefinite recess of the proceedings to attempt further settlement negotiations. In November 1993, the parties reached a partial settlement, which provided a range of prospective, class-wide injunctive relief including a hiring and promotion quota, aggressive recruiting at historically black colleges and universities, and the establishment of a grievance procedure for employees.

This proposed consent decree was set for a fairness hearing on January 19, 1994. On January 13, the Adams intervenors moved the court to intervene in the proceedings to challenge the race-conscious provisions of the decree. The court granted the Adams intervenors' motion "to the extent that these non-class employees are permitted to intervene and challenge the race-conscious provisions of the proposed consent decree." *Reynolds v. Roberts,* 846 F.Supp. 948, 954 (M.D.Ala.1994) (Thompson, J.).

With the participation of the Adams intervenors, the parties decided to divide the previously proposed consent decree into three parts: consent decree I contained provisions that all sides agreed were race neutral; consent decrees II and III contained allegedly race-conscious provisions acceptable to the plaintiffs and the defendants, but opposed by the Adams intervenors. The parties presented consent

decree I for approval and, after another fairness hearing, the decree was entered.

### 2. January 2000 Contempt Order

Since the entry of consent decree I, this litigation has primarily involved the implementation of its terms. Consent decree I is composed of a series of articles that restructure the process by which the Alabama Transportation Department and the Alabama State Personnel Department hire, promote, classify, and pay Transportation Department employees. It also creates new procedures for, among other things, rotation of job duties, training, and recruitment. Most articles include a deadline for implementation or, at a minimum, a deadline by which plans for implementation were to be submitted to the court. Further, article XX established a framework for proceeding on individual claims of discrimination by class members against the defendants.

The so-called article XX claims were the subject of extensive negotiations between the parties and numerous orders by this court, and led to six months of court proceedings in 1997 and 1998. Before the court issued a ruling on the merits of the approximately 80 litigated claims, the parties proposed a framework for resolving all claims in the class. After hearing testimony on how to identify members of the plaintiff class that were entitled to relief and on the appropriate back-pay formula, the court entered judgment granting injured merit employees $ 34,732,487, including interest. *See Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1156 (M.D.Ala.1998) (Thompson, J.);[9] Order of April 16, 1997.[10] The Eleventh Circuit

vacated and remanded this judgment with instructions to the court that, "in order to obtain individual relief, the members of the three plaintiff classes must prove that the Department discriminated against them on account of their race." *Reynolds I,* 202 F.3d at 1319. No further court proceedings have been held on these article XX claims, though their resolution has been one subject of the extensive negotiations leading to the plaintiffs' settlement.

Similar problems became apparent with certain aspects of the consent decree's prospective injunctive relief. By 1996, the court and the parties learned that the defendants had made little or no progress developing validated race-neutral selection procedures as required by articles II, III, VIII and XIV. Accordingly, the plaintiffs filed a series of contempt motions concerning the defendants' noncompliance.[11] The Adams intervenors filed a motion for contempt enforcement through race-neutral means.[12]

The defendants' present noncompliance with consent decree I is not in dispute, nor is it contested that they are in contempt of court. In December 1999, the parties submitted an agreement on remedies for this contempt. Based on this agreement, the court entered a contempt order on January 31, 2000, adopting the parties' framework for coercive sanctions. *See Reynolds v. Alabama Dep't of Transp.*, 84 F.Supp.2d 1339 (M.D.Ala.2000) (Thompson, J.)[13] Specifically, the January 2000 contempt order sets a series of deadlines by which the defendants have the burden of demonstrating that they have come into compliance

---

**9.** Doc. no. 2523.

**10.** Doc. no. 1785. The award resolved the backpay claims of approximately 2,400 plaintiff class members, and provided backpay to 2,137 plaintiff-class members for the discrimination they faced in the time period from 1979 to 1997.

**11.** *See* Doc. nos. 1542, 1543, 2624, & 2825.

**12.** *See* Doc. no. 4167.

**13.** Doc. no. 4284.

with each article of the decree.[14] If the defendants remain out of compliance, they become subject to a fixed structure of increasing fines for each article. Further, if the defendants remain out of compliance for 90 days, the court is to "set an emergency hearing to determine appropriate additional sanctions and remedies."[15]

Deadlines for compliance came and went with little progress by the defendants. Currently, the defendants remain out of full compliance on all but two articles (articles XVII and XVIII) covered in the January 2000 contempt order. Under the interim terms of the plaintiffs' and the intervenors' proposed settlements, discussed more fully below, fines for contempt of articles I, VI, VII, IX, X, XI, XIII, XV, XVI, and XIX have been held in abeyance since December 19, 2000.[16] The defendants continue to pay contempt fines on articles II, III, VIII, and XIV.

To date, the defendants have paid a total of $ 6,762,500 in fines. Of this sum, $ 1,586,500 has been "temporarily" refunded pursuant to the proposed settlements' interim terms, with the result that $ 5,176,000 is on deposit with the court as of today and with that sum now growing at a weekly rate of $ 42,000.

In light of the remanded article XX claims and the continued, and growing, contempt fines, the plaintiffs and the defendants entered into mediation during the latter half of 2000, which led to the plaintiffs' proposed settlement. The plaintiffs' settlement was presented to the court in January 2001. The defendants then turned to settlement discussions with the Adams intervenors, leading to the intervenors' settlement presented to the court in April 2001.

### 3. The Appellate Mandates

Of the numerous appeals taken in this case, the Eleventh Circuit has issued three published decisions. *Reynolds I* was issued on cross appeals by the defendants and the plaintiffs from this court's entry of judgment on the article XX individual claims. As stated, *Reynolds I* vacated that judgment, holding this court erroneously concluded that consent decree I had established discrimination by the department against members of the plaintiff classes.[17] Absent that erroneous finding, the Eleventh Circuit concluded that insufficient grounds had been proven to establish that the defendants were liable for class-wide prospective relief (aside from that provided in consent decree I) or individual class-member claims for relief.[18] *See Reynolds I*, 202 F.3d at 1319–20.

*Reynolds I* emphasized that consent decrees are to be interpreted as contracts and that, when a consent decree is ambiguous, a court should look to extrinsic evidence to determine the parties' intent. *See* 202 F.3d at 1312–13. However, *Reynolds I* also reiterated that "long standing precedent evinces a strong ^public policy against judicial rewriting of consent decrees." *Id.* at 1312. Accordingly, this court's interpretation of the pending settlements will heed the instructions of *Reynolds I* to construe agreements between the parties strictly, being careful to avoid improper judicial rewriting.

---

**14.** *See id.* at 1346–47.

**15.** *See id.* at 1344.

**16.** On April 27, 2001, the court refunded to the defendants $ 1,586,500 for fines paid on these articles from December 19, 2001 to April 26, 2001, pursuant to these agreements.

**17.** This court explained its reasoning in *Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1156 (M.D.Ala.1998) (Thompson, J.) (Doc. no. 2523).

**18.** *Reynolds I* did not disturb those parts of consent decree I that settled claims for prospective injunctive relief. *See* 202 F.3d at 1319.

The article XIX grievance procedure provided a second opportunity for the Eleventh Circuit to revisit this litigation. That dispute arose over the participation of white Transportation Department employees in the grievance procedure intended to provide employees with recourse for defendants' noncompliance with the consent decree. This court found that three white employees had improperly used the grievance procedure to gain provisional appointments, with backpay, through private settlements of grievances between employees and supervisors in violation of the terms of consent decree I. *Reynolds v. Alabama Department of Transportation*, 996 F.Supp. 1130 (M.D.Ala.1998) (Thompson, J.). The court stated that the private grievance settlement would allow employees to "circumvent open and fair competition for jobs in the Transportation Department" and thus would "permit [ ] precisely the type of noncompetitive, hand-selection and favoritism that was to be abolished and protected against by the decree." *Id.* at 1156–1157 (quotation marks and citations omitted). The court therefore declared that provisionally appointing the three white employees violated consent decree I. *Id.* at 1156.

In *Reynolds II*, the Eleventh Circuit read this court as having held that the grievance procedure was available to only African–American Transportation Department employees. *See* 207 F.3d at 1301. While this court did not intend its restrictions on private settlement to apply to only white employees but rather intended that they should apply across the board so as to create a level playing field, that was the reading the Eleventh Circuit gave, and, of course, *Reynolds II* is not only circuit precedent it is the law of the case. The *Reynolds II* court therefore vacated this court's order, concluding that the remedies in consent decree I were available to all Alabama Transportation Department employees, regardless of race.

Two bases of the *Reynolds II* decision are particularly relevant to the present proceedings. First, *Reynolds II* reiterated *Reynolds I*'s caution that this court should be careful not to rewrite consent decrees. *Reynolds II* noted that by agreement of the parties all provisions in consent decree I were understood to be race-neutral, and that nothing in consent decree I or article XIX implied that the remedies available through the grievance procedure were available to African Americans only. *Reynolds II*, 207 F.3d at 1300. By limiting the availability of this relief to African Americans, this court, according to *Reynolds II*, rewrote consent decree I.

Second, the court explained the proper method by which a party must enforce the consent decree in light of alleged violations.

"If the plaintiff (the party obtaining the writ) believes that the defendant (the enjoined party) is failing to comply with the decree's mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned. The plaintiff's motion cites the injunctive provision at issue and alleges that the defendant has refused to obey its mandate. If satisfied that the plaintiff's motion states a case of noncompliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for that purpose. At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant. At the end of the day, the court determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to ensure compliance."

*Reynolds II*, 207 F.3d at 1298 (internal citations omitted). In front of this court, the plaintiffs had moved for an injunction

to prevent the Alabama Department of Transportation from granting article XIX relief to three white employees. This court eventually entered a declaratory judgment finding that white Transportation Department employees could not use the grievance procedure. Because the plaintiffs had not moved the court for contempt sanctions under the procedure described above, the *Reynolds II* court concluded that this court's order granting declaratory relief had no effect. Again, *Reynolds II* squarely governs the present case and both settlements now before the court.

*Reynolds III* was issued less than a week before the instant proceedings were scheduled to begin, and after most briefing had been completed.[19] That decision addressed this court's order and injunction adopting ¶ 4 of article XIII of consent decree II, which concerned offers of reclassification to incumbent employees in the graduate civil engineer class. Consent decree II contains provisions at one point agreed upon by the plaintiffs and the defendants and to which the Adams intervenors objected prior to the entry of the first, race-neutral, consent decree. When the plaintiffs moved the court to adopt this paragraph, the Adams intervenors maintained their objections and the defendants took the position that the provisions of consent decree II (and III) were no longer constitutional in light of *Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548 (11th Cir.1994) and *In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d 1525 (11th Cir.1994). The plaintiffs contended that consent decrees II and III remained before the court for entry on consent of the parties to the litigation: the plaintiffs and the defendants. Construing

consent decree II as a contract between the plaintiffs and the defendants, the court entered the paragraph, concluding that it satisfied the strict-scrutiny analysis required for race-conscious relief.[20]

In reversing this court's order, *Reynolds III* announced an important, indeed a fundamental, rule for this case concerning the status of the Adams intervenors. Although the Adams intervenors were originally made parties "to challenge the race-conscious provisions of the proposed consent decree," *Reynolds III* places the Adams intervenors on par with the plaintiffs and the defendants as a party with enforceable rights:

> "The intervenors have legal rights at stake in this litigation, namely rights under the Equal Protection Clause, Title VII, and state merit-system law to compete for state jobs on a race-neutral basis. The clear law of this circuit is that "a consent decree requires the consent of all parties whose legal rights would be adversely affected by the decree." *United States v. City of Hialeah,* 140 F.3d 968, 975 (11th Cir.1998); *see also White v. Alabama,* 74 F.3d 1058, 1073 (11th Cir.1996) ("In this circuit, a decree that provides a remedy agreed to by some, but not all, of the parties cannot affect the rights of a dissenting party."); *id.* at 1076 (Black, J., specially concurring) ("Once a party intervenes, he becomes a full participant and is entitled to have his claims litigated.")."

*Reynolds III,* 251 F.3d at 1355 n. 12.

This court understands *Reynolds III* to settle the ongoing dispute between the plaintiffs and the Adams intervenors: whether the Adams intervenors have standing to do anything more than object

---

19. In light of *Reynolds III,* the court concluded that a delay in the evidentiary portion of the proceedings was necessary so that the parties had time to modify their presentations and submit supplemental briefing.

20. *See Reynolds v. Alabama Dep't of Transp.,* 996 F.Supp. 1118 (M.D. Ala.1998) (Doc. no. 2413).

to race-conscious provisions of consent decree I. As the court will discuss in detail below, they do. The ramifications of this conclusion are significant and, in conjunction with the dictates of *Reynolds I* and *Reynolds II*, compel in significant part the outcome of this decision. Before applying these three appellate mandates, however, the court will take one more historical detour to review the history of the present motions.

### B. Pending Matters

#### 1. Plaintiffs' Settlement

In large part, the settlements now before the court are the latest manifestations of disputes that have been before this court since consent decree I was entered in 1994. Renewed interest in settlement was sparked by two events: (1) the rejection in *Reynolds I* for claims for individual relief; and (2) the increasing weekly fines on the defendants pursuant to the January 2000 contempt order for their continued noncompliance with consent decree I. By the fall of 2000, the plaintiffs and the defendants were engaged in daily mediation which led to their settlement agreement.[21] The plaintiffs' settlement, which provides for both monetary (up to $ 59.6 million) and non-monetary relief, purports to resolve a wide range of the plaintiffs' claims against the defendants. It has five primary components: (1) resolution of all individual claims for monetary and non-monetary relief under consent decree I or for racial discrimination against African Americans who have been employed by the Alabama Transportation Department at any time since May 1979; (2) resolution of all individual claims for monetary and non-monetary relief under consent decree I or for racial discrimination against African–

American applicants for employment with the Transportation Department at any time since May 1979; (3) resolution of all individual claims by African Americans for monetary relief due to non-compliance with the terms of consent decree I; (4) a moratorium, retroactive to December 19, 2000, on the payment of all contempt sanctions by the defendants for a period of twelve months, and the possibility of a continuing moratorium on fines for certain other aspects of consent decree I that require the validation and administration of new selection procedures; and (5) a delay in the administration of new selection procedures until after the implementation of certain training and rotation programs at the Transportation Department. Of these five components, the fine moratorium and testing delay are subject of the most significant objections from the Adams intervenors.

For the one-year period starting December 19, 2000, the moratorium went into effect immediately pending even final approval of the settlement, with the proviso that the defendants would have to pay the full amount of all fines that would have been due absent the moratorium if the defendants remained out of compliance at the end of the moratorium. The plaintiffs and the defendants stipulated that the threat of lump-sum payments was equally as coercive as the weekly fine scheme already in place.[22] The moratorium also contains tolling provisions that could effectively extend the moratorium beyond one calendar year under certain conditions.

With respect to the administration of tests, the defendants agreed not to administer any non-entry level, non-SPD project class examinations or transportation-specific classification examinations,[23] or use

---

**21.** Although the Adams intervenors were aware of these settlement negotiations, they were not participants in them.

**22.** *See* plaintiffs' settlement at 39.

**23.** In consent decree I, the following positions were defined as SPD project classes: High-

any non-entry level, non-SPD project classification register to fill positions at the Transportation Department until rotation for persons in feeder classes relevant to the examination had been implemented.[24] Because some of these validated tests were scheduled for administration when the plaintiffs' settlement was signed, this provision required the defendants to cancel some examinations and continue to hold in abeyance the administration of others. Accordingly, the plaintiffs and the defendants agreed that the expiration of the moratorium would be tolled during the rotation period.

In anticipation of an objection to the test delay by the Adams intervenors, the plaintiffs' settlement has two noteworthy provisions. First, it requires the defendants to support the test delay during litigation without taking a position concerning the substantive merits of whether a test delay should be approved by the court; in other words, while employees of the defendants could be called to testify with respect to factual matters concerning test administration, training, and rotation, the defendants agreed they would not assert to the court that a test delay is, or is not, in its view necessary for compliance with consent decree I.[25] Second, the test-delay provision is severable from the remaining provisions of

the moratorium; that is, the plaintiffs and the defendants agreed that, if the Adams intervenors prevail on their (then-anticipated) objections to the test delay, the moratorium, and the entire settlement, would not fail.

The Adams intervenors' objections to the plaintiffs' settlement came directly,[26] and indirectly by way of their motion for further contempt relief.[27] The impetus behind the Adams intervenors' contempt motion was the defendants' decision to postpone the administration of eight promotional examinations scheduled for the end of 2000 and into 2001.[28] Within a week of learning that the terms of the plaintiffs' settlement called for a testing delay, the Adams intervenors moved for further contempt sanctions against the defendants, including injunctive relief preventing the court from cancelling promotional examinations, increased fines, and entry of an order with a strict implementation schedule for test administration. Approval of the plaintiffs' settlement, the Adams intervenors argue, would only exacerbate this contemptuous behavior.

From the outset, the Adams intervenors urged this court to reject the testing delay and part of the moratorium because these required modifications to consent decree I,

---

way Maintenance Technician, Engineering Assistant, Professional Civil Engineer Trainee, Graduate Civil Engineer, Graduate Registered Engineer, Civil Engineer, Professional Civil Engineer, Right–of–Way Specialist, Project Cost Auditor, and Highway Office Manager. See Reynolds, 1994 WL 899259 at *10.

**24.** See id. at 29. While the plaintiffs' settlement provided for a testing delay until the implementation of job rotation and training, the primary concern for the plaintiffs is job rotation as they claim is required under articles XIV and XVI. Because of this concern, the court focuses on job rotation as it would impact the administration of the examinations and the operation of the moratorium in the plaintiffs' settlement.

**25.** See id. at 30.

**26.** See Notice of Adams intervenors' objections to plaintiffs-defendants settlement agreement, filed May 14, 2000 (Doc. no. 4994).

**27.** See Adams intervenors' motion for further contempt relief and for modification, filed January 8, 2001 (Doc. no. 4691).

**28.** The defendants first notified the parties in September 2000 that validated examinations for the civil engineer manager position would be held in November 2000. Citing ongoing settlement negotiations with the plaintiffs, the defendants temporarily delayed the examinations, leading to the longer-term delay agreed to in the plaintiffs' settlement.

the January 2000 contempt agreement, and this court's order implementing interim selection procedures.[29] Because the Adams intervenors did not consent to modification of any of these orders and because, they argued, the plaintiff and the defendants had not shown changed law or facts sufficient to authorize modification of the parties' agreements under *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), they were due to be rejected. In light of *Reynolds III,* these arguments proved prescient.

The Adams intervenors, as stated, also raised objections concerning the continued use of the interim selection procedure. The plaintiffs' settlement provides that the interim selection procedure—albeit in a modified form—will be the defendants' primary means of filling vacancies until the job rotation is completed. The Adams intervenors have contended that the interim selection procedure has an adverse impact against non-African Americans.[30] The Adams intervenors contend the long-term use of these admittedly unvalidated tests requires further modifications of the court's prior orders. Finally, the Adams intervenors object to the defendants' reliance on their expert consultants, Personnel Decisions Research Institutes, to determine when the rotations obligations of the decree have been satisfied.[31] According to the Adams intervenors, the plaintiffs and the defendants, through their agreement in the settlement to delegate, have improperly foreclosed any position the intervenors may take concerning compliance with the rotation provisions of consent decree I.[32]

### 2. Adams Intervenors' Settlement

Before *Reynolds III* was issued, the Adams intervenors and the defendants submitted their own settlement for the court's approval. The intervenors' settlement, which, as stated, provides for both monetary ($ 8.35 million) and non-monetary relief, has three primary components: (1) resolution of all individual claims for monetary relief for violations of the reclassification and multi-grade classification requirements of article XV of consent decree I; (2) resolution of all individual claims for monetary relief for individual grievances seeking backpay or promotions; and (3) a one-year moratorium (retroactive to December 14, 2000) for fines ordered by the January 2000 contempt order for noncompliance with all pending articles under consent decree I, except articles II, III, VIII, and XIV, the articles related to testing.

Therefore, both the intervenors' and the plaintiffs' settlements contain fine moratorium provisions, though they differ on the critical issue of the testing delay. The Adams intervenors have not agreed to a moratorium on any article that would further delay the administration of validated employment examinations (articles II, III, VIII and XIV). In effect, the intervenors' settlement is a subset of the moratorium in the plaintiffs' settlement. However, the plaintiffs' settlement has no provisions for the partial approval of its moratorium, nor does the severability clause for the testing delay provision extend to the moratorium. As the court will discuss below, this differ-

---

**29.** *See* Order of February 26, 1999 (Doc. no. 3701); Joint report of the parties, filed February 16, 1999 (Doc. no. 3639).

**30.** *See* Adams intervenors' show-cause response concerning interim selection procedures, filed March 21, 2001 (Doc. no. 4873)

(claiming the interim selection procedure has adverse impact against whites).

**31.** *See* Plaintiffs' settlement at 31.

**32.** *See* Notice of Adams intervenors' objections to plaintiffs-defendants settlement agreement (Doc. no. 4994) at 4.

ence is an important one in the context of the relief and approvals now sought by the parties.

The plaintiffs' objections to the intervenors' settlement fall into two categories. First, they assert their general objections to the Adams intervenors' standing, claiming that the Adams intervenors cannot enforce race-neutral relief or receive compensation for defendants' contempt of race-neutral injunctive relief. Second, they attack the reasonableness and fairness of the monetary settlement of article XV reclassification claims.

An additional issue concerning the intervenors' settlement was raised at the May 29 fairness hearing: the failure of the Adams intervenors and the defendants to include an opt-out provision for intervenor-class members who do not want to participate in the monetary part of the settlement. The issue was raised in an objection by intervenor-class member Cliff Massey both in written form to the Adams intervenors and orally to the court at the fairness hearing.

### 3. Modification Motions

An ongoing matter of dispute between the plaintiffs and the Adams intervenors with respect to the pending settlements has been whether the plaintiffs were required to file a motion under Rule 60 of the Federal Rules of Civil Procedure in order to have their settlement properly before the court for approval. The Adams intervenors raised this objection from the outset, arguing that, without their consent to some terms of the settlement, the plaintiff had to, but could not, meet the burden to modify a consent decree under Rule 60, *Rufo*, and *Ensley Branch*. The plaintiffs

and the defendants' joint motion to approve settlement did not reference Rule 60, and it was the plaintiffs' position that a Rule 60 motion was not necessary. Nonetheless, before the fairness hearings began, the plaintiffs agreed to file a Rule 60 motion for approval of their settlement, though the plaintiffs understood the filing to be purely procedural in nature.

In light of *Reynolds III* and the plaintiffs' failure to file their Rule 60 motion before the hearings began, the Adams intervenors again raised the issue as the court began to hear evidence. The court concluded that it would be imprudent to proceed before the Rule 60 issue was properly before it, and recessed the proceedings for three weeks. The court ordered the plaintiffs and the defendants to file a substantive Rule 60 motion for modification, and further ordered the Adams intervenors and the defendants to submit a Rule 60 motion with respect to approval of their settlement. Like the plaintiffs, the Adams intervenors objected to the requirement of a Rule 60 modification motion for their settlement. All parties complied with the court's orders without waiving their rights to raise these objections now. The plaintiffs and the defendants filed separate motions for modification for their settlement;[33] the Adams intervenors and the defendants filed a joint motion for modification.[34]

## II. DISCUSSION

### A. Standing of the Adams Intervenors

■ The court begins with the question on which all others depend: what standing do the Adams intervenors have in this

---

**33.** *See* Defendants' motion for modification of contempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5038); Plaintiffs' supplement to motion to approve settlements for further relief, or modification of court's civil con-

tempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5040).

**34.** *See* Adams intervenors and defendants' joint motion, in the alternative, for modification, filed June 12, 2001 (Doc. no. 5059).

litigation? Based on *Reynolds II* and *Reynolds III,* this court finds that the Adams intervenors have standing participate fully in the matters currently before the court. That means that they have the right to object to the plaintiffs' settlement and the right to reach their own settlement with the defendants.

■ *Reynolds III* concluded the Adams intervenors have "legal rights at stake in this litigation" and the "clear law of this circuit is that 'a consent decree requires the consent of all parties whose legal rights would be adversely affected by the decree.'" 251 F.3d at 1355 n. 12 (*quoting United States v. City of Hialeah,* 140 F.3d 968, 975 (11th Cir.1998)). It is true, as the plaintiffs note, that *Reynolds III* resolved a dispute over race-conscious relief contained in consent decree II. The plaintiffs argue that in light of the merits of the *Reynolds III* appeal, that decision confirms only the obvious: that the Adams intervenors have the limited right, as they initially requested and as set forth in the court's order granting intervention, to object to or "challenge the race-conscious provisions of the proposed consent decree." *Reynolds v. Roberts,* 846 F.Supp. 948, 954 (M.D.Ala.1994) (Thompson, J.). However, this limited reading does not comport with either the language of *Reynolds III,* which has no such limitation, or *Reynolds II.*

In this court's ruling on the matters addressed in *Reynolds III,* the court operated under the assumption that it had the authority to adopt the proposed paragraph in consent decree II so long as the remedies the plaintiffs' requested could withstand the Adams intervenors' objections by passing strict constitutional scrutiny. When the plaintiffs moved to enter the paragraph, the defendants took the position that the paragraph did violate the law. In essence, the defendants sought to withdraw from their agreement on grounds that it was no longer legal. However, the court implicitly rejected the defendants' claim of illegality by concluding that strict scrutiny had been satisfied. Thus, because consent decrees are to be treated as contracts between the parties, because the plaintiffs and the defendants had agreed to the provisions of consent decree II and were contractually bound to it (pending entry by the court), and because the defendants had established no grounds under contract principles to withdraw from their agreement with the plaintiffs, the court entered the paragraph at issue.

The *Reynolds III* court did not address this contract argument, concluding summarily instead that because the defendants did not consent to the paragraph that it could not be entered with consent of the parties. But more importantly, the Eleventh Circuit then went on to conclude that even if the defendants did consent to the paragraph, it could not be entered because the *Adams intervenors did not consent to it* either. With regard to proposed settlements or agreements in this litigation, the appellate court did not view the Adams intervenors' intervention status as limited merely to the right to make challenges or objections (which the court could then overrule or sustain on the merits) but rather that they have the right to give and withhold consent (a right which is no different from the veto right the plaintiffs and the defendants have over settlements and agreements that would affect them in this litigation). In so finding, *Reynolds III* established the full rights of the Adams intervenors and put them on a par with the plaintiffs and the defendants.

This understanding of the Adams intervenors' status is reinforced by *Reynolds II,* where the Eleventh Circuit made clear that the provisions of consent decree I do not provide special benefits or procedures for the Transportation Department's Afri-

can–American employees and that the provisions of the decree are available to employees without regard to race. *See* 207 F.3d at 1293, 1300. In effect, *Reynolds II* implicitly gave the Adams intervenors the right to enforce the terms of consent decree I—terms that are by agreement of all parties race neutral.

In light of *Reynolds II* and Reynolds III, it cannot be plausibly concluded that the Adams intervenors' "rights at stake in this litigation" are limited to making objections and challenges to the race-conscious provisions in this litigation. If they have the right to take advantage of the race-neutral provisions of consent decree I, like article XIX, and enforce compliance with that decree, then the "rights" referred to in *Reynolds III* cannot be limited to challenge race-conscious relief. Although that may have been the original purpose for Adams intervenors' intervention, the Eleventh Circuit has made clear that original purpose no longer obtains.

■ Finally, even if, despite *Reynolds II* and *Reynolds III*, the Adams intervenors' participatory right under consent decree I could be viewed as limited to challenging race-conscious relief, that view would not apply to the January 2000 contempt order. That order established the comprehensive scheme of fines now in place to coerce defendants' compliance with the terms of consent decree I. All three parties—the plaintiffs, the defendants, and the Adams intervenors—signed the contempt order. *See Reynolds,* 84 F.Supp.2d at 1349–50. As a result, the Adams intervenors must agree to any modifications to it proposed by the plaintiffs and the defendants in order for the court to adopt them upon consent of the parties. To be sure, in signing the contempt order, the plaintiffs reserved their objections to the intervenors' standing in this litigation. But that objection can no longer hold sway, one and a half years

later, now that the contempt order has been put into effect and the parties have proceeded based on it. Therefore, to the extent that the various agreements before the court require changes to the January 2000 contempt order, the same rule holds: all three parties to this litigation must agree before the court can approve such changes.

That said, it should go without saying that what is good for the goose is good for the gander. For any agreement that the Adams intervenors ask for the court's approval on the basis of consent, they too must have the consent of *all* parties. Curiously, that is not the position taken by the Adams intervenors with respect to their settlement agreement with the defendants. The court will address this position when it discusses the intervenors' settlement. For now, though, the court wishes to make clear that consent means consent by all parties involved in this litigation: the plaintiffs, the defendants and the Adams intervenors.

### B. Plaintiffs' Settlement

Now that the Adams intervenors' standing to object to the plaintiffs' settlement has been confirmed, the court must determine whether the plaintiffs' settlement is due to be approved. The first question is whether the proposed settlement affects the rights of the Adams intervenors. If it does not, then their consent may not be needed. The second question, assuming the settlement does affect their rights, is whether the Adams intervenors have in fact consented to its terms. With consent of all parties, the court can approve the settlement under Rule 23 of the Federal Rules of Civil Procedure. Without consent, then the court can approve the settlement only if the plaintiffs and the defendants establish sufficient "changed circumstances" pursuant to Rule 60 of the Federal Rules of Civil Procedure to justify modification of prior

court orders. The court now turns to these three questions.

### 1. Does the Plaintiffs' Settlement Affect the Rights of the Adams Intervenors?

■ The Adams intervenors have identified at least three ways in which the plaintiffs' settlement modifies consent decree I, the January 2000 contempt order, and the court's order implementing the interim selection procedure: (1) the test delay; (2) the contempt fine moratorium; and (3) continuation, in a modified form, of the interim selection procedure until training and rotation has been completed and validated examinations can be administered. By making these modifications, the Adams intervenors argue, their rights are affected by plaintiffs' settlement. The court agrees with the Adams intervenors to the extent that it finds the test delay and fine moratorium affect their rights and require a modification of the January 2000 contempt order. This alone is sufficient to require either the consent of the Adams intervenors or a showing of changed circumstances by the plaintiffs and the defendants.

Four articles of consent decree I require the defendants to development and implement validated selection procedures: article II (validated minimum qualifications); article III (validated selection procedures); and article VIII (standard, job-related interviews) and article XIV (selection procedures). There is no dispute that the defendants had not met the requirements of these four articles when the January 2000 contempt order was entered. This contempt was established in the stipulations of fact between the plaintiffs and the defendants.[35]

Paragraph 34 of the contempt stipulations establishes that the court had entered a schedule on January 26, 1999, for the defendants to tender to the plaintiffs proposed new examinations for all nine of the classifications currently at issue.[36] That January 26 scheduling order adopted plaintiffs and defendants' joint submissions of a proposed revised schedule from completion of SPD-project-class validation work.[37] At that point, nearly a year before the January 2000 contempt order, the parties agreed to deadlines by which objections to the submission of final validation reports would be made. According to this schedule, objections were to be submitted between February 15, 1999, and October 1, 1999, depending on the exam.[38]

Also, in the stipulations, the plaintiffs and the defendants agreed that the defendants had not yet developed a means of assuring that employees were periodically rotated into assignments and duties that were identified as preparation for examination and promotion.[39] In December 1998, the Transportation Department had

---

35. *See* stipulations of fact, filed August 13, 1999 (Doc. no. 4147). The Adams intervenors did not join in these stipulations, as it was their position that remedies for contempt could only be entered on consent of all parties, or after a full evidentiary proceeding.

36. *See* Order of January 26, 1999 (Doc. no. 3542).

37. *See* Joint submission, filed January 19, 1999 (Doc. no. 3502).

38. For the civil engineer I examination, the first of the validated examinations that was scheduled for actual administration in late

2000, objections were due by February 15, 1999. Final validated examinations currently exist for the job classifications of civil engineer, civil engineer manager, civil engineer administrator, civil engineer senior administrator, senior right of way specialist, senior real property valuation analyst, highway maintenance technician II/III, highway maintenance superintendent, and transportation office manager. *See* Exhibits 160–168.

39. *See* stipulations of fact, filed August 13, 1999 (Doc. No. 4147) at ¶¶ 161–63.

engaged expert consultants to develop a rotation scheme for the engineering assistant and civil engineer classifications that complied with the requirements of consent decree I.[40]

In light of the stipulated facts and in an effort to coerce the defendants into prompt compliance with consent decree I, the parties agreed to and this court entered a renewed deadline of December 31, 2000, for implementation of articles II and III; May 15, 2000, for article VIII; and April 30, 2000, for article XIV. The parties further agreed that the best method of achieving compliance was a framework of increasing fines set to begin on each of these dates if the defendants remained out of compliance. *See Reynolds,* 84 F.Supp.2d at 1344–45. There is no dispute that the defendants did not meet these dates and that fines have been and currently are being imposed.

The test delay and fine moratorium proposed in the plaintiffs' settlement agreement work together to modify the agreement reached by all parties in the January 2000 contempt order. Through the contempt order, the parties concurred that the most expeditious way for the defendants to reach compliance was a weekly fine structure with fixed completion dates for each article. The plaintiffs' settlement effectively relieves them of this burden for the year beginning December 2000. If the defendants come into compliance during that period, by agreement those fines would be waived.

In light of this modification, the moratorium is not the contempt enforcement mechanism to which *all* parties agreed. Granted, if the defendants are not in compliance at the end of the one-year moratorium, then they would be required to pay the full amount of the accrued penalty.

This lump-sum may, at the end of the day, produce the same dollar amount as the existing weekly fine structure, but it also may not. Either way, it is not the fine structure to which the parties agreed, and, no matter how phrased, it amounts to a modification.

Of course, the effect of this modification would be limited to one year only under a best-case scenario where the job rotation is completed before the end of the moratorium period (December 2001). Based on the representations made by the parties, the court finds this scenario almost certainly will not occur. In their settlement, the plaintiffs and the defendants represent that rotation will take 12 to 18 months, during which the fines will continued to be tolled on the four testing articles.

"Defendants will not administer any non-entry level SPD Project class examination or Transportation-specific classification examination ... or use any non-entry level non-SPD project classification register to fill positions at [the Alabama Transportation Department], until Rotation for persons in feeder classes relevant to the examination has been implemented and in operation for eighteen months for the feeder classes relevant to Civil Engineer and Civil Engineer Manager examinations, and for twelve months for other such examinations, or for such shorter period as may be required for [the Transportation Department] to satisfy its Rotation obligation to employees in such feeder classes under consent decree I. [The Transportation Department] represents that on the basis of an opinion provided to it by [the Personnel Decisions Research Institutes], it believes that a period of up to eighteen months, or twelve months, as applicable, is an adequate time for it to comply with its Rotation

40. *See id.* at ¶ 162. Importantly, the parties have never stipulated that consent decree I

requires rotation to be completed before the administration of the validated examinations.

obligation under Consent Decree I relative to any feeder classes. The moratorium period will be tolled until Rotation has been implemented and in operation for the specified period, or for such other period as may be required for [the Transportation Department] to comply with its Rotation obligation under Consent Decree I . . . ."[41]

If the plaintiffs' settlement is approved in its entirety, this tolling would result in an even greater modification of the contempt order framework. The tolling provisions also, in effect, require the completion of some of the articles (rotation) before others (administration of validated examinations). It may be, as the plaintiffs have argued extensively, that the terms of consent decree I require article XVI rotation to occur before the administration of the examinations. However, the court need not make that finding in order to conclude that such a delay requires a modification of the January 2000 contempt order.[42] The contempt order does not expressly provide for such prioritization; there, the dates set for compliance with each article are not expressly contingent upon compliance with any other article.

Of course, the court recognizes that pursuant to the severability clause in the plaintiffs' settlement it may reject the testing delay and eliminate this possibility. That still leaves, though, the one-year moratorium as a modification. One modification is modification enough. The court concludes that the plaintiffs' settlement modifies the January 2000 contempt order, which remains in effect by agreement of the parties.

The plaintiffs further contend that their settlement does not actually affect the rights of the Adams intervenors because no party has requested anything not already within the power of the court.[43] The

---

**41.** Plaintiffs' settlement at 28–29. The moratorium can also be tolled for delays caused by the parties while reviewing defendants' compliance and other reasons outside the control of the defendants.

**42.** The court recognizes that its decision not to reach the test-delay issue does not mean it will go away. One result of today's decision may be to put the test-delay issue before the court but in a posture in which *all* parties can take a position. Currently, the issue has been litigated with the defendants (the party with responsibility for implementing the requirements of the decree) remaining neutral due to agreements it has made with each party in the respective proposed settlements. The defendants' neutrality makes any determination by this court on the merits more difficult, because on an important and difficult question of the interpretation of consent decree I, the court does not have the benefit of the position by one of the signatories to that agreement.

Indeed, to the extent that today's decision leaves substantive matters unresolved, it would appear that they are appropriately handled in the form of contempt proceedings. The difference will be that the defendants—the party to be held in contempt if warrant-

ed—will have the freedom to take a position on the merits and advocate that position to the court. It is troubling to the court to make decisions that will significantly affect the defendants with the defendants silently sitting on the sidelines.

**43.** In particular, the plaintiffs point to paragraphs 36, 38 and 43 of the January 2000 contempt order, which state:

"(36) The parties stipulate that time is of the essence and that there are to be no extensions of the deadlines for compliance, and no excuses or justifications recognized for any failure to meet such deadlines, unless otherwise agreed by the parties hereto or ordered by the court.

. . . . .

"(38) The remedies agreement resolves the issues of the defendants' contempt to the extent set forth herein, subject to the provisions of the section above on non-coercive remedies and sanctions above. The agreement and the initial order entering the agreed upon finding of contempt and adopting the remedies set forth herein do not resolve or preclude the court from re-

plaintiffs' settlement expressly states that the court can impose further relief if it determines "on its own, or pursuant to an argument made by other parties to the litigation, that contempt fines are the only relief appropriate to remedy Defendants' failure to make adequate progress towards compliance with the validation related provisions of Consent Decree I." [44] To varying degrees the Adams intervenors and the defendants have also argued that the court's ongoing power to enter contempt sanctions may provide a way to accept certain parts of the pending agreements while rejecting others. [45] Be this as it may, nothing the court can do prospectively regarding contempt changes the fact that the plaintiffs and the defendants are proposing modifications of court orders that affect the rights of all parties.

The court understands two iterations of the preserved-contempt-power argument, one advanced primarily by the plaintiffs, the other by the Adams intervenors. The plaintiffs contend that no modifications are required because the Adams intervenors retain the rights and remedies they have always had: to seek contempt relief and object to the settlement. [46] This leads the plaintiffs to conclude that the court can adopt their settlement over the objections of the Adams intervenors because the Adams intervenors can simply petition the court for contempt relief. [47]

This argument makes little sense. By approving the plaintiffs' settlement, the court affects the rights of the Adams intervenors (adversely by their account) by authorizing the testing delay. It also imposes a moratorium to which the Adams intervenors have not fully agreed. The intervenors' right to object is not a hollow one and they have exercised it. Because they may still have remedies even if the court were to adopt the settlement does not change the fact that the settlement is being entered without their consent, affects their present rights, and requires a modification of prior court orders.

The Adams intervenors take a slightly different tack. Also relying on their preserved power to seek contempt relief, they urge the court to sever the test delay in the plaintiffs' settlement as that settlement allows the court to do, approve the remainder of the plaintiffs' settlement and the intervenors' settlement in full, and then enter orders—namely reinstitute contempt fines for articles II, III, XVIII, and XIV— to move the defendants toward full compliance with the testing-related articles of the consent decree. [48]

solving any issues or claims other than the following two issues: (1) whether the defendants have been and are in contempt of consent decree I and the court's orders and injunctions related to its enforcement, and (2) what coercive remedies should be entered for such contempt....

. . . . .

"(43) The parties agree that the court retains jurisdiction over the remedies agreement and any order implementing the agreement until the issues regarding the defendants' contempt (including issues of compensatory relief) are resolved and the defendants have achieved full compliance with the consent decree provisions that are the subject of the agreement."
*Reynolds,* 84 F.Supp.2d at 1350–51.

**44.** Plaintiffs' settlement at 35.

**45.** *See* Transcript of June 18, 2001, hearing at 8–23.

**46.** In light of *Reynolds III*, the intervenors' rights are much broader than the plaintiffs have previously accepted, but the point the plaintiffs make is that their power, whatever it may be, remains unaffected by the plaintiffs' settlement.

**47.** *See* Transcript of July 31, 2001, oral argument.

**48.** *See* Transcript of June 18, 2001, hearing at 4–6.; *see also* Transcript of July 31, 2001, oral argument.

This argument also makes little sense. The effect of this maneuver would be to give the benefits of the settlement with one hand, while taking with the other. While severing the test-delay resolves one issue, reinstituting contempt fines runs afoul of the plaintiffs and defendants' moratorium agreement. In effect, the intervenors' suggestion would negate the power of the defendants to void the settlement if the contempt and moratorium provisions are not approved.[49] By accepting the plaintiffs' settlement, the court would bind the defendants to its terms. By simultaneously instituting fines otherwise covered by the moratorium, the court would prevent the defendants from obtaining the full benefit of their bargain from their settlement. Even if the court had the power to do this, it is loathe to exalt the letter of the agreements over their spirit, especially when doing so would require the court to act in bad faith. The court will not approve one set of terms and immediately thereafter and without any additional evidence change its mind.

The plaintiffs' settlement unquestionably affects the present rights of the Adams intervenors. The court obviously retains its power to issue further contempt sanctions, but that does not free it from ruling on the evidence placed before it. On some of the substantive matters now pending, the plaintiffs and the Adams intervenors have taken opposing positions. The evidence cannot simultaneously support both sides. In light of this court's disposition of the settlements, it need not reach these substantive issues. But for present purposes it is sufficient to conclude that there is no way to resolve the matters pending before the court without either consent from all the parties, or sufficient grounds for modification.

### 2. Do All Parties Consent to the Necessary Modifications?

All told, the answer to the first question is clearly yes; plaintiffs' settlement affects the Adams intervenors' rights by modifying, at least, their rights as established in the January 2000 contempt order. Therefore, the court must turn to the question of consent, but it need not tarry long in concluding that the Adams intervenors do not consent to the plaintiffs' moratorium agreement.[50] Without the consent of the Adams intervenors, the plaintiffs' settlement cannot be approved by consent of the parties and pursuant to Rule 23 of the Federal Rules of Civil Procedure.

### 3. Have Changed Circumstances Been Established?

■ Because the plaintiffs' settlement requires modification of a prior order of the court and because the Adams intervenors have not consented to the plaintiffs' settlement in its entirety, then the plaintiffs' settlement can be adopted only if the requirements of Rule 60(b) of the Federal Rules of Civil Procedure have been met.[51]

---

**49.** *See* Plaintiffs' settlement at 21.

**50.** These objections are set forth succinctly in the notice of Adams intervenors' objections to plaintiff-defendant settlement agreement dated January 16, 2001, filed May 14, 2001 (Doc. no. 4994).

**51.** Fed.R. Civ.P. 60(b), Relief from Judgment or Order, reads in relevant part:

"Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time.... A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation."

*See Rufo,* 502 U.S. 367, 112 S.Ct. 748; *Ensley Branch,* 31 F.3d 1548. To be precise, the parties are not asking the court to approve their settlements under *Rufo.* They have asked the court to modify any prior orders which the court finds require modification in light of the agreements made by the parties in their settlement. By making those modifications and adopting the settlement to the extent the intervenors' consent is either not needed or has been given, the parties contend that the full agreement can be approved.

■ In *Rufo,* the United States Supreme Court "articulated a two-pronged approach to determining when, and to what extent an institutional-reform consent decree that 'arguably relates to the vindication of a constitutional right' should be modified.' " *Ensley Branch,* 31 F.3d at 1563. "The first prong requires the party seeking modification to 'establish that a significant change in facts or law warrants revision of the decree.' " *Id. (quoting Rufo,* 502 U.S. at 384, 112 S.Ct. at 765). In addition, grounds for modification under *Rufo* can be met in the Eleventh Circuit upon a showing that "significant time has passed and the objectives of the original agreement have not been met, . . . continuance is no longer warranted, or . . . a continuation would be inequitable and each side has legitimate interests to be considered." *Jacksonville Branch, N.A.A.C.P. v. Duval County Sch. Bd.,* 978 F.2d 1574, 1582 (11th Cir.1992). "If the moving party satisfies this requirement, then the second prong requires the Court to make modifications that are 'suitably tailored' to address the new factual or legal environment." *Ensley Branch,* 31 F.3d at 1563. Under both *Rufo* and *Ensley Branch,* the party seeking modification bears the bur-

den of establishing a significant change in circumstances.

■ By proceeding under the *Rufo*-and-Rule-60 framework, the plaintiffs and the defendants are in a significantly different posture with respect to their settlement. Were the court simply presented with a consent decree to approve pursuant to Rule 23 of the Federal Rules of Civil Procedure, approval would be warranted so long as the decree were not "unconstitutional, unlawful, unreasonable, or contrary to public policy." *Stovall v. City of Cocoa,* 117 F.3d 1238, 1239 (11th Cir.1997). Under *Rufo* and Rule 60, the moving party "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo,* 502 U.S. at 385, 112 S.Ct. at 761. Because the court concludes that this showing has not been made, it need not reach the second issue, whether the proposed modifications are sufficiently tailored to the changed circumstance.

The plaintiffs proffer two changed circumstances justifying approval of their settlement under *Rufo.* First, they contend that *"Rufo's* standards are satisfied here because defendants unexpectedly completed development of new examinations *before* they completed the training and rotation programs that Consent Decree I had scheduled to be completed *first."* [52] It has been the plaintiffs' position that job rotation must be completed before examinations are given. They rely heavily on the deadlines in consent decree I which set the completion date for rotation before test administration. As noted earlier, the defendants had completed nine of these examinations by the fall 2000. And while the parties seem to agree that the defendants have taken significant steps in providing

---

52. Plaintiffs' supplement to motion to approve settlement, filed June 5, 2001 (Doc. no. 5040), at 6 (emphasis in original).

classroom training to employees through its Accelerated University program, there remains real dispute over the need for job rotation and non-classroom training before examinations are administered.

The plaintiffs' second argument for modification under *Rufo* is that the "accidental" inversion of the testing and rotation requirements of consent decree I "opened the door" to pressure to administer those examinations before the rotation.[53] That pressure, of course, came from the Adams intervenors, who view the new delay in the administration of completed validated examinations as further contemptuous behavior.[54] The plaintiffs contend that the intervenors' motion for further contempt makes compliance with the consent decree substantially more onerous.

The defendants offered their own motion for modification and did not join the plaintiffs in theirs because of the defendants' required neutrality on the test delay.[55] As a result, the defendants offer a more tepid argument in favor of modification. Essentially, they rest on the progress they have made in developing validated tests and otherwise attempting to comply with consent decree I, and they reiterate the position taken by the plaintiffs and the defendants that their full compliance with consent decree I is best achieved by the moratorium and test delays set forth in plaintiffs' settlement. Further, they point to the mere happen-

ing of a settlement with the plaintiffs— and the thousands of monetary claims that it resolves—as a changed circumstance in an of itself.[56]

These purported changed circumstances share a common characteristic: they are all based on the progress, or lack thereof, of the defendants in meeting their obligations under the myriad court orders governing their actions. In other words, the proffered changed circumstances are based on the defendants' continued noncompliance with consent decree I, the issue addressed in the January 2000 contempt order. As such, the court finds that they cannot meet the standard set in *Rufo*.

 To succeed under *Rufo*, the moving party must show changed circumstances that were unforeseen, though not unforeseeable, at the time parties entered their agreement.

"If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60."

*Id.* at 385, 112 S.Ct. at 761. Whether a fact was unforeseen is determined by representations of the parties and findings of

53. *See id.* at 9–10.

54. *See* Adams intervenors' motion for further contempt relief and for modification, filed January 8, 2001 (Doc. no. 4691), at 5. In the fall 2000, the defendants had gone as far as notifying eligible candidates of test dates for at least one of the validated examinations. They subsequently cancelled these examinations apparently because of the pending settlement with the plaintiffs.

55. *See* defendants' motion for modification of contempt order, filed June 5, 2001 (Doc. no.

5038); *see also* defendants' submission concerning plaintiffs' motion for modification, filed June 5, 2001 (Doc. no. 5039).

56. In response to similar arguments by the Adams intervenors, the plaintiffs observe that this argument is "circular and self-fulfilling at best." Plaintiffs' opposition to defendants' and Adams intervenors' joint motion in the alternative for modification, filed June 14, 2001 (Doc. no. 5062), at 3 ("The change in circumstances must be antecedent to, and independent from, the proposed response to such change.")

the court at the time the agreement was entered. *See, e.g., Sims v. Montgomery County Com'n,* 934 F.Supp. 1314, 1324 (M.D.Ala.1996) (Thompson, J.) (unforeseen change when expert's opinion changed after consent decree was entered and after the expert reviewed results of employment tests given pursuant to the decree); *Wyatt v. King,* 811 F.Supp. 1533, 1544 (M.D.Ala. 1993) (Thompson, J.) (no changed circumstances where later decisions by the court merely reaffirmed obligations the parties were already under when they entered into the agreement at issue.)

There are two ways to interpret plaintiffs' and defendants' arguments. One way is to understand them to argue that the defendants' attempt to comply with consent decree I has put them in a position of violating its terms. In light of the stipulations of fact between the plaintiffs and the defendants, however, the court finds it difficult to credit plaintiffs' argument that the defendants' readiness to give validated examinations before completion of rotation has come as a surprise. This foreseeable likelihood existed when the January 2000 contempt order was agreed upon by the parties and entered by the court.

To be sure, few of the dates set for compliance with an order of this court have subsequently proven themselves to be firm ones. But as of the January 2000 contempt order, the plaintiffs and the defendants were aware of at least two things. First, the defendants were making progress on developing validated examinations for the SPD classifications. Although not complete and approved, draft examinations were being circulated among the parties' experts. Second, the defendants had not begun in any substantial measure the process of job rotation as required by article XVI.

With marked progress being made on test validation and marked lack of progress being made on rotation, the parties should have anticipated the likelihood, at least, that the examinations could be ready before rotation was complete. The plaintiffs and the defendants now represent that the rotation process will take between 12 and 18 months to implement. Although it is not clear when the experts informed the parties that the rotation process would take this length of time, the parties must have known that by its very nature job rotation would take some period of time to complete. It takes little additional effort to conclude that from the perspective of the January 2000 contempt order, even when the validated examinations were approved by all parties, the parties would have to wait for the then-lagging rotation process to be implemented *and* completed before the examinations could be given.

With this potential timing problem plainly apparent, it is surprising that there is no tolling provision in the contempt order for the testing article fines, or at least a grace period of 12 to 18 months between the expected completion of the training and rotation articles and the beginning of fines for failure to administer validated tests. "Ordinarily, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo,* 502 U.S. at 385, 112 S.Ct. at 760. If the need for a delay could have been anticipated when the parties entered the contempt agreement, and it was not addressed in the contempt agreement, the plaintiffs cannot now argue that it is a changed circumstance that requires the court to modify the January 2000 contempt order.

The other way of understanding what the plaintiffs and the defendants mean by changed circumstances is to understand them to argue that defendants' partial compliance with consent decree I is a reason to modify the coercive sanctions they currently face. Again, this argument fails

because defendants' partial compliance was entirely foreseeable (if not, indeed, actually foreseen) at the time all parties agreed to the January 2000 contempt order. Because it could reasonably be foreseen, it could have been included by the parties in their agreement. It may be that the plaintiffs and the defendants now believe that their proposed moratorium is as coercive as the framework agreed to by the plaintiffs, the defendants, and the Adams intervenors.[57] And it may be that the 14–article moratorium was the price of settlement with the defendants. But without the Adams intervenors' consent on the testing-article moratorium, there can be no consensual agreement to change the terms of the January 2000 contempt order. And without evidence of an unforeseen change in circumstance, there can be no modification.

The plaintiffs maintain that the case of *Juan F. v. Weicker,* 37 F.3d 874 (2nd Cir.1994), is instructive in this situation especially as it is pertains to changes enacted by a court to prompt compliance with the fundamental purpose of a decree. *Juan F.* is instructive, but for a different reason. In *Juan F.,* the district court ordered that government defendants adopt a staggered hiring schedule so new hires could be trained and placed within the time frame originally agreed upon by the parties. The schedule was necessary in light of budget cuts faced by the defendants. The Second Circuit Court of Appeals concluded that the staggered schedule was not a modification because it "simply ensured compliance" with the original agreement. *See id.* at 878–79.

As *Juan F* recognizes, the *Rufo* standard is intended to be a flexible one that should not prevent courts from making adaptations to complicated decrees in light of changing conditions. *See Rufo,* 502 U.S. at 383, 112 S.Ct. at 760. The important difference between this case and *Juan F.* is that here the court is considering modifications to a decree that established a remedial scheme for noncompliance with yet another order of the court, consent decree I. The January 2000 contempt order is one degree removed from the order establishing the defendants' underlying obligations. The January 2000 contempt order is itself the way the parties agreed to "simply ensure compliance" with consent decree I. In doing so, the plaintiffs, the defendants, and the Adams intervenors agreed to new compliance deadlines for each article of the decree, and a time-sensitive framework of coercive fines.

The deadlines entered by the court in *Juan F.,* though new to the decree establishing the defendants' substantive obligations, did nothing to change the expectations of the parties as established in the original decree; they were corollary to the decree's primary purpose. Deadlines are integral to the primary purpose of the January 2000 contempt order. The parties agreed that these deadlines, and their associated fines, were the best means of achieving the goal of the contempt order. Specifically, the parties stipulated that "time is of the essence and that there are to be no extensions of the deadlines for compliance, and no excuses or justifications recognized for any failure to meet

---

57. *See* Plaintiffs' settlement at 39 ("As condition of obtaining Plaintiffs' consent to the moratorium period, Defendants have affirmatively advocated to Plaintiffs that this agreement is equally as coercive as the current Contempt Order, that it is not intended to compromise the coercive effect of that Order; that it is not intended to compromise the coercive effect of that Order; that compliance cannot be achieved in less time regardless of the fines imposed; and that the problems associated with continuing non-compliance can best be addressed through this Agreement as opposed to contemporaneous fine payments.")

such deadlines, unless otherwise agreed to be the parties or ordered by the court." *Reynolds*, 84 F.Supp.2d at 1349. In light of these provisions, the moratorium must be seen as altering a fundamental part of the bargain made by the parties in the January 2000 contempt order.

The court notes that the flexibility required by the *Rufo* standard is in tension with "long standing precedent [that] evinces a strong public policy against judicial rewriting of consent decrees." *Reynolds I*, 202 F.3d at 1312. On one hand, flexibility implies the court should have the power to modify as equity and fairness dictate. On the other, an agreement is an agreement and the court must protect the rights of one party when the other two seek to make a change. It would seem, though, that where the parties claim that changed circumstances exist because of contemptuous behavior that the parties have already (and recently) attempted to address through a contempt order entered on consent, the preexisting agreement of the parties should prevail. Otherwise,

*Rufo* and Rule 60 could become a way around the contempt proceedings already held by the court and mandated by *Reynolds II*.

This conclusion is fatal to the plaintiffs' settlement. Although the severability clause of the plaintiffs' settlement provides that the settlement is not void if the court rejects the test delay,[58] there is no such severability clause concerning a rejection of the contempt fine moratorium. The plaintiffs' settlement requests a moratorium on *all* fines and the court cannot approve such a moratorium without agreement from the Adams intervenors. The full moratorium lies at the heart of the plaintiffs' settlement and is not severable by its terms. Accordingly, the court cannot approve plaintiffs' settlement.[59]

### C. Intervenors' Settlement

The intervenors' settlement is subject to the same analysis as the plaintiffs' settlement.[60] First, does the settlement propose modifications to either consent decree I, the January 2000 contempt order, or any

---

**58.** *See* Plaintiffs' settlement at 31.

**59.** Rejection of the plaintiffs' settlement is tantamount to a denial of the three pending motions seeking approval of that settlement. *See* Plaintiffs' and defendants' joint motion and stipulation concerning approval of proposed settlement, filed January 16, 2001 (Doc. no. 4700); Plaintiffs' supplement to motion to approve settlements for further relief, or modification of court's civil contempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5040); Defendants' motion for modification of contempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5038). With respect to plaintiffs' supplement to motion to approve settlements for further relief, or modification of court's civil contempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5040), the court has one further comment. Much to the surprise of the defendants, the plaintiffs used their motion for modification to request "alternative remedies" in the event the court did not approve the settlement. According to the plaintiffs, these remedies were proposed be-

cause "the Court must still adopt *some* means of achieving the basic purposes of the training and rotation provisions of Consent Decree I." Plaintiffs' supplement to motion to approve settlements for further relief, or modification of court's civil contempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5040), at 17 (emphasis in original). Be that as it may, the current proceedings are not an appropriate forum for this request because it raises substantial and new issues that have not been briefed by the parties. Therefore, in denying plaintiffs' motion, the court notes that it will be denied without prejudice as to this additional relief. If the plaintiffs' maintain their position in light of today's opinion and order, they can file an appropriate motion to put these issues properly before the court.

**60.** The court's preliminary determination that the Adams intervenors have standing to participate in this litigation means that the plaintiffs' repeated contention that the Adams intervenors do not have standing to enter into a settlement is meritless.

other agreement affecting the rights of the plaintiffs? Second, if modifications are proposed, do all parties consent? Third, if all parties do not consent, have the Adams intervenors and the defendants established sufficient changed circumstances to authorize this court to enter a modification to effected orders without consent of all parties?

▮ The court's prior analysis of the plaintiffs' settlement holds equally true to the intervenors' settlement on the question of modification and the plaintiffs' rights. The intervenors' settlement proposes a moratorium on fines for the non-testing provisions of the January 2000 contempt order. Such a moratorium is not provided for in that order. The difference in scope between the moratoria in the plaintiffs' and intervenors' settlements is not material to whether the intervenors' moratorium is in fact a modification. Both modify that order.

The Adams intervenors and the defendants also cannot establish that all parties consent to the terms of their settlement. The Adams intervenors and the defendants take the position that "all parties have consented to a one-year moratorium as to ten articles of the decree." [61] They argue that the plaintiffs have approved their moratorium implicitly because their moratorium is a subset of the moratorium to which the plaintiffs agreed in their settlement. This argument fails for at least two reasons. First, the court is bound to follow the terms of agreements between the parties. *See Reynolds I*, 202 F.3d at 1312. The plaintiffs and the defendants agreed to a moratorium on *all* fines. Not only does the plain language of the plaintiffs' settlement not consider a lesser moratorium, but the plaintiffs have made clear that they agreed to no less than a full moratorium.[62] In light of the plaintiffs' position on the test delay, this position is not surprising. Second, the court has rejected the plaintiffs' settlement so any argument that that settlement provides consent is now moot.

The Adams intervenors and the defendants also contend that the moratorium that has been in place since April 26, 2001, by consent of the parties when the court gave preliminary approval to the intervenor settlement,[63] is further evidence that the plaintiffs consent to the moratorium in the intervenor settlement.[64] When the

---

**61.** Defendants' and Adams intervenors' joint motion, in the alternative, for modification, filed June 12, 2001 (Doc. no. 5059).

**62.** *See* Plaintiffs' opposition to defendants' and Adams intervenors' joint motion in the alternative for modification, filed June 14, 2001 (Doc. no. 5062) at 6 ("[P]laintiffs have consistently *opposed the intervenors' moratorium agreement* because it omits key provisions that were part of the bargained-for exchange which formed the basis for plaintiffs' consent to any form of moratorium") (emphasis in original). The Adams intervenors and the defendants make much of this statement by Robert Wiggins, counsel for the plaintiffs:

"[T]here is ten out of fourteen articles that we're in agreement on. All parties are in agreement on. On these four articles that we're in disagreement on, the intervenors believe that the fines ought to continue.

Our settlement agreement says we don't think they should, but if you disagree with us, they can continue and still adopt the settlement agreement."
Transcript of May 30, 2001, hearing at 23. The full context of this statement shows that the plaintiffs have not independently agreed to the intervenors' moratorium, but only note that if the plaintiffs' settlement is approved, its full moratorium would provide implicit consent for the intervenors' more limited moratorium.

**63.** *See* Defendants' unopposed motion for refund of contempt fines, filed April 20, 2001 (Doc. no. 4949).

**64.** The requested moratorium included a refund of fines paid on those ten articles dating back to the moratorium start-date of December 19, 2000.

Adams intervenors and the defendants reached agreement on their settlement, all three parties agreed to relieve the defendants immediately from paying fines on the ten non-testing articles. To claim that this refund of fines, based on the court's preliminary approval of the two settlements, indicates the plaintiffs' consent to the terms of the Adams intervenors' moratorium is at best a creative argument. Had the court approved both settlements, then the fine refund would have been appropriate to give the defendants the full benefit of their bargain. Now that the court has determined that the plaintiffs' settlement is due to be rejected, there is no residual consent based on actions taken by them while their settlement was still pending. In rejecting the plaintiffs' settlement, the court understands all agreements in that settlement to be rescinded and understands that the pending fines are to be paid to the court in full. Further, there is nothing else in the record to establish the plaintiffs' consent to a moratorium of fines on the non-testing articles.

■ As with the plaintiffs' settlement, the intervenors' settlement proposes modification of agreements made by the parties, and these modifications do not have consent of all parties to these agreements; therefore the Adams intervenors and the defendants must meet the standard for modification of consent decrees under Rule 60 and *Rufo*. The Adams intervenors and the defendants, however, offer even more scant grounds for modification than those offered by the plaintiffs and the defendants. In its entirety, their argument is that the changed circumstance is "substantial, continuing progress toward compliance with the ten [training] articles of consent decree I." [65] As already noted, this is merely circular and self-fulfilling. To accept the position that a defendants' progress toward compliance with a consent decree as prompted by coercive contempt sanctions could, in an of itself, support grounds for modification of the agreement instituting these sanctions would render the sanctions a nullity as soon as they began to take effect.

Contempt sanctions are supposed to hasten a defendant's full compliance with a consent decree. In the January 2000 contempt order, the defendants agreed to "demonstrate affirmatively their *full compliance* with each provision of consent decree I by the *deadlines agreed upon by the parties*." *Reynolds*, 84 F.Supp.2d at 1344 (emphasis added). "If such affirmative demonstration, as confirmed by either a stipulation of the parties or order of the court, has not occurred prior to the deadlines for automatic sanctions agreed upon," the order continued, "then ... sanctions will commence on each such deadline until such time as the court determines that the defendants have achieved full compliance with the subject article of consent decree I and related orders and injunctions." *Id.* Plainly, the contempt fines can only be relieved upon an affirmative showing by defendants of full compliance. To say that modification of the fines is warranted at the point the fines begin to work misses the point of the contempt sanctions: to coerce full compliance with consent decree I. Allowing less absent truly changed circumstances requires consent of all parties.

At bottom, what all parties have attempted to do in the pending settlements is trade off *Rufo* modifications for monetary relief.[66] Both the plaintiffs and the

---

**65.** Defendants' and Adams intervenors' joint motion, in the alternative, for modification, filed June 13, 2001 (Doc. no. 5059) at 11.

**66.** Although this argument applies both to the plaintiffs' and intervenors' settlements, in fairness to the plaintiffs, the court recognizes that their original position was that modification was not needed for their settlement to be approved.

Adams intervenors have represented to the court that the monetary aspects of these settlements are paramount. According to counsel for the Adams intervenors at oral argument on July 31, 2001, "The bulk of the intervenors' settlement involves monetary relief. It's a monetary settlement only." And counsel for plaintiffs similarly extolled: "[T]he most important issue of all those pending before you is the resolution of the claims of the class members that have been pending before the Court for sixteen years." The requested modifications are incidental and instrumental.

Indeed and most tellingly, it appears that no party would be seeking modification of the existing decrees if monetary relief were not on the table.[67] The Adams intervenors state in brief: "The intervenors have agreed to and support the moratorium described herein as a part of the intervenor-defendant settlement. Their consent to that moratorium and their joining in this motion are in support of and conditioned upon approval of that settlement. The Adams intervenors have not consented to and do not move for a moratorium in the absence of approval of the remainder of the intervenor-defendant settlement."

 *Rufo* modifications should not be used as a bald-faced trade-off for money. If any party sincerely believes that *Rufo* modifications are warranted, then that party should have moved for such before the settlements were presented to the court and thus independent from the possibility of receiving money as part of a settlement. The court reminds the parties that consent decrees governing institutional reform must operate in the public interest. *See Rufo*, 502 U.S. at 384, 112 S.Ct. at 760; *United States v. City of Miami*, 2 F.3d 1497, 1506 & n. 30 (11th Cir.1993).

The parties understandably will have different views of what the public's interest is, but that does not give them license to take insincere positions in front of the court to settle their claims to the harm or objection of third-parties that have rights at stake in the litigation.

*Rufo* modifications should not be used as an end-run around the requirement that all parties with rights affected must consent to an agreement before it can be adopted by the court as a binding consent order. This requirement was unequivocally stated by the Eleventh Circuit in *Reynolds III*. Moreover, in *Reynolds II* the Eleventh Circuit emphasized the importance of strict compliance with contempt procedures. There are set procedures for finding that a defendant has purged itself of contempt. Those procedures, not *Rufo*, must be used to relieve the defendants of their current contempt burden.

### III. CONCLUSION

 The court does not reject these settlements with either ease or pleasure. In fact, the court believes that the monetary aspects of the settlements—if presented to the court by themselves—are fair and reasonable and would be due to be approved. However, for each settlement, the monetary relief was presented to the court packaged with non-monetary relief inconsistent between the plaintiffs' and the intervenors' settlements and, as the court discussed above, contrary to the law of this case. Because settlements are negotiated agreements between the parties, the court cannot pick-and-choose what relief can be granted and what relief cannot. Unless those agreements give the court the power to sever some parts and approve others, each settlement must be approved or denied as a whole. At the end of the day the

---

67. *See, e.g.*, Defendants' and Adams intervenors' joint motion, in the alternative, for mod-

ification, filed June 12, 2001, (Doc. no. 5059) at n. 2.

parties, not the court, must propose a fair, reasonable, *and* legal settlement. In these settlements, the parties have failed that task.

In rejecting these settlements, the court also recognizes, as stated, that they were reached only after the expenditure of significant time and taxpayer money. More importantly, the court recognizes that its decision today for now prevents many individuals from receiving compensation for claims they have against the defendants—for some plaintiffs, these claims of race discrimination date back over 20 years. Nonetheless, this court cannot ignore the Eleventh Circuit's recent and clear directives in *Reynolds II* and *Reynolds III*.

An appropriate order will be entered.

## ORDER

In accordance with the opinion also entered on this date, it is ORDERED as follows:

(1) Plaintiffs' and defendants' joint motion and stipulation concerning approval of proposed settlement, filed January 16, 2001 (Doc. no. 4700), is denied.

(2) Defendants' motion for modification of contempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5038), is denied.

(3) Plaintiffs' supplement to motion to approve settlements for further relief, or modification of court's civil contempt order (Doc. no. 4284), filed June 5, 2001 (Doc. no. 5040), is denied.

(4) Adams intervenors and defendants' motion and stipulation concerning approval of proposed settlement agreement, filed April 13, 2001 (Doc. no. 4923), is denied.

(5) Adams intervenors and defendants' joint motion, in the alternative, for modification, filed June 12, 2001 (Doc. no. 5059), is denied.